Glen A. MARTIN, Appellant,

v.

Harris P. DARCY, Appellee.

No. 13907.

Court of Civil Appeals of Texas.

San Antonio.

April 25, 1962.

Rehearing Denied May 23, 1962.

Matthews, Nowlin, Macfarlane & Barrett, Richard E. Goldsmith, San Antonio, for appellant.

Edward Penshorn, Bradford F. Miller, San Antonio, for appellee.

POPE, Justice.

Plaintiff, Harris P. Darcy, sued Glen A. Martin for breach of a farm-out agreement,[1] and recovered $3,500 damages under

---

1. "A farm-out agreement is a comtract to assign oil and gas lease rights in certain acreage upon the completion of drilling obligations and the performance of any other covenants and conditions therein contained. It is an executory contract. It is largely used in cases where the owner of a lease is unable or unwilling to drill on a lease which is nearing expira-tion, but is willing to assign an interest therein to another who will assume the drilling obligations and save the lease from expiring. Often the owner of the lease retains an overriding royalty or a carried interest as his consideration." Institute on Oil and Gas Law and Taxation (Fifth Annual), p. 69.

the express terms of the contract, and an additional $3,000 for loss of profits. Martin, by this appeal, insists that the trial court erred (1) in submitting the first special issue which called upon the jury to construe the legal instrument, (2) in submitting the second issue and rendering judgment upon it, when there was no evidence in support of the issue, and (3) in making its own findings upon the amount of lost profits, when there was no evidence of the elements of lost profits. In our opinion, Martin, is correct in his contentions about the first and third points, and wrong about the second.

In early July of 1959, Darcy owned the minerals under 671 acres of McMullen County land by force of an assignment from Sun Oil Company. Sun's assignment obligated Darcy to "begin by August 10, 1959, the actual drilling of a well" on the tract. Darcy also held three dry hole contribution letters by which Ohio Oil Company agreed to contribute $6,500, Western Natural Gas Company, $3,150, and El Paso Natural Gas Company, $3,150 toward the drilling of a well. Sun's assignment to Darcy and each of the dry-hole letters to Darcy, prohibited his assignment without prior written consent.

Darcy and Martin began negotiations by which Darcy would assign his rights and obligations to Martin. On July 29, 1959, Martin accepted the terms of a letter which Darcy had written him. By that agreement, Darcy assigned his rights and obligations to Martin. The letter described each of the four documents which Darcy had from the four oil companies. Martin assumed the obligation to drill the well. The contract provided that Darcy would receive $1,500 in the event Martin completed the well as a producer, or $3,500 in the event it was a dry hole. Darcy also retained one-eighth of the oil and other minerals in the property.

Martin's letter of transmittal, from San Antonio to Darcy in Houston, called on Darcy to send him the consents to the assignment from the four oil companies. On July 31, upon receipt of Martin's acceptance, Darcy wrote each oil company based in Texas, and asked for its consent. On August 4, Martin wrote Darcy, "since I do not have letters giving permission for you to assign cannot take the deal as outlined in our letter of agreement." On August 6, Darcy went to Martin's office with consents from Ohio and Western. Martin refused to examine or consider them. On August 7, Darcy returned to Martin's office with the Sun consent and a telegram from El Paso, which stated that its consent was already mailed. It was received on August 8. During Darcy's visit on August 7, he delivered a letter to Martin with attached consents from all but El Paso Oil Company, whose telegram was attached. Darcy by his letter called on Martin to comply with his drilling obligation. Martin did not drill the well. It was later drilled by other persons and was completed as a dry hole. The parties treat the well as a dry hole. Darcy claimed that he was entitled to the contract amount of $3,500 because the well was a dry hole. Martin claimed that Darcy breached the contract by failing to furnish the consents.

■ Darcy's first point is that the court improperly asked the jury whether the parties to the contract contemplated and agreed that Darcy would obtain the consents to the assignments in time for Martin, in the exercise of reasonable diligence, to commence the actual drilling of the well by August 10. The jury said "No". According to the jury, the parties contemplated that Martin would proceed in disregard of the four contracts which required consents. This advice from the jury is not helpful, for Martin, as a matter of law, could move on the lease premises without Sun's consent only at the risk of being a trespasser. Cage Bros. v. Whiteman, 139 Tex. 522, 163 S.W.2d 638; Kelvin Lumber & Supply Co. v. Copper State Mining Co., Tex.Civ.App., 232 S.W. 858. The first special issue, however, was surplusage, because the second was a proper submission.

Defendant Martin's next point is that there is no evidence which supports the jury's finding to the second issue. The jury found that Darcy obtained the required written consents in sufficient time for Martin, in the exercise of reasonable diligence, to have commenced the actual drilling of the well by August 10, 1959. Martin's sole attack upon that finding is that there is no evidence to support it. Our search of the record shows that there is much direct evidence and many inferences which support the finding. When Martin accepted the contract and mailed his letter on July 29 from San Antonio to Houston, he knew that he had only thirteen days before the crucial date. In a sense, both parties knew from the beginning that time was limited. Both parties knew that the consents were necessary. Sun's consent to move on the premises was available on August 7. All consents were in hand on August 8. Martin still had August 8 and all of August 9 and 10, to begin actual drilling. Armstrong v. Palmer, Tex.Civ.App., 218 S.W. 627; Goldman v. Broyles, Tex.Civ.App., 141 S.W. 283; Andres v. Armstrong, 168 Cal.App.2d 344, 335 P.2d 1005; Heinsch v. Kirby, 223 Minn. 302, 26 N.W.2d 363. The question is not whether this Court disagrees with the finding, but to decide if there is more than a scintilla of evidence upon which the jury could have made such a finding. Martin details the steps incident to actual drilling. One must reach an agreement with a driller; a drilling permit must be obtained; the site must be surveyed, staked and cleared; pits must be dug; water must be obtained; the rig must be moved, set up, and the bit actually turned. However, the evidence in the record shows that these steps usually are taken simultaneously. While one thing is being done, others are also being executed. There is proof that many steps, short of entering upon the premises, as normal procedure, would be taken even before Sun gave its consent. The proof shows that Martin had in fact already engaged a driller for the well, but let him go on August 4. The driller's rig was in Live Oak County, which adjoins McMullen County, and was available. Martin could have taken steps to obtain a drilling permit. The proof from several witnesses is that even after August 8 he could have obtained a permit as a routine matter. The Railroad Commission has an office in San Antonio. There was evidence that applications may be made by telegraph and are often granted on the same day. One witness testified at length and offered several of his former telegraphic applications and permits in evidence. One permit was obtained in three hours. Witnesses testified that staking, clearing and digging the pits would take about half a day, and such work is usually and often done while the rig is moving along the highway to the premises. Mr. Scott, an experienced oil man, testified to these facts. He stated that men and equipment for this work were readily available. Mr. Rigby, a driller, testified that it was not unusual for a driller to move and be completely rigged up on the same day. The most compelling evidence, however, is supplied by Martin himself. When Darcy went to Martin's office on August 6, after receiving Martin's letter that he was withdrawing from the deal, according to Darcy, Martin told him, "I don't need an extension. I can drill it tomorrow if I want to." Certainly there was evidence, and the court properly submitted the dispute to the jury. On the basis of that jury finding, Martin had time to commence actual drilling, and in failing to do so breached the contract.

The trial court granted Darcy an additional $3,000 for lost profits. This was error. There were no jury issues submitted, but the court found as facts that Darcy proved that his retained one-eighth mineral interest had a market value of $6,000, and that he would have sold one-half of it for $3,000 prior to completion of the well. Martin urges that there is no evidence in the record which supports such findings. The point is good. For breach of a contract to drill one may recover the loss of value of royalty and mineral interest during drilling but prior to completion as a dry hole. Hardwick v. Jackson, Tex.Civ.App.,

315 S.W.2d 440; Guardian Trust Co. v. Brothers, Tex.Civ.App., 59 S.W.2d 343, 345. Such a recovery gives the wronged party the benefit of performance of the contract. Whiteside v. Trentman, 141 Tex. 46, 170 S.W.2d 195.

It is not the rule of law, but the failure to prove the elements of such damages which defeats Darcy's recovery of profits. Whiteside v. Trentman, supra, permits such recovery upon proof (1) that the profits may reasonably be supposed to have been in the contemplation of the parties when the contract was made, and (2) that Darcy would have sold his interest prior to completion as a dry hole. Darcy's proof failed to meet either of these tests.

The critical time at which profits must have been in the contemplation of the parties, according to Whiteside v. Trentman is "when the contract was made." Accord, Atchison, T. & S. F. Ry. Co. v. Butler, 127 Tex. 154, 93 S.W.2d 143; Missouri, K. & T. R. Co. of Texas v. Belcher, 89 Tex. 428, 35 S.W. 6; 17 Tex.Jur.2d 62. The only proof as of that time is that it is well known in the oil industry that some persons do make sales of their royalty and mineral interest during drilling operations. But it is equally well known that other persons hold their interest in the hope of a producing well. The proof, therefore, was that some sell and others do not. This record does not show that Martin, or even Darcy, at that time, had any reason to believe that the mineral interest would or would not be sold. The proof shows that nobody knew what would be done.

The general rule about lost profits is stated in Whiteside v. Trentman, and it is apparent that the rule is taken verbatim from Hadley v. Baxendale, 9 Exch. 341, 26 Eng. L. & E. 398. The balance of the Baxendale rule, with respect to notice of contemplated profits, is applicable to this case for the reasons that are well expressed by that opinion:

"We think the proper rule in such a case as the present is this: Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be either such as may fairly and substantially be considered as arising naturally, i. e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases, not affected by any special circumstances, for such a breach of contract. For had the special circumstances been known, the parties might have expressly provided for the breach of contract by special terms as to the damage in that case, and of this advantage it would be very unjust to deprive them. The above principles are those by which we think the jury ought to be guided in estimating the damages arising out of any breach of contract."

Darcy did not prove by more than a scintilla of evidence the other element—that he would have sold his retained interest. There is scarcely anything in the record about the matter. Darcy stated that he could have sold one-half of his retained interest. He said he had a verbal trade.

 

The person with whom he said he had such a trade, described it as a "tentative" deal which was never consummated. There was no evidence, as that term is used in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, that Darcy had a $3,000 loss of profits.

The judgment is affirmed insofar as it awarded damages of $3,500 provided in the contract. It is reversed and rendered by denying the additional recovery of $3,000 for lost profits. Since the appeal was prosecuted with effect, costs are adjudged against appellee, Darcy.