STATE ex rel. BOARD OF TRUSTEES
OF the CITY OF NORTH KANSAS
CITY MEMORIAL HOSPITAL, Rela-
tor,

v.

Honorable David W. RUSSELL,
Judge, Circuit Court, Clay
County, Respondent.

No. 74606.

Supreme Court of Missouri,
En Banc.

Dec. 18, 1992.

Rehearing Denied Jan. 27, 1993.

**354**

William L. Yocum, William E. Quirk and Michael S. Ketchmark, Kansas City, for relator.

John H. Norton, Kansas City, John B. Ewing, Jr., Sarasota, FL and John W. McKay, Kansas City, for respondent.

THOMAS, Judge.

This case presents the issue of whether and to what extent sovereign immunity shields a Chapter 96 city hospital from liability for medical malpractice. That a city enjoys immunity from liability arising from operation of a hospital is well settled. *See, e.g., Zummo v. Kansas City,* 285 Mo. 222, 225 S.W. 934 (1920). We conclude that the result is no different when the hospital is operated by a board of trustees pursuant to Chapter 96, RSMo.

1. The suit also named other defendants who have no claim to sovereign immunity.

2. A discogram is a type of x-ray procedure in which a contrast medium is injected into the spaces between the bones of the patient's spine

## I. FACTUAL AND PROCEDURAL BACKGROUND

The dispute arises from a medical malpractice suit in Clay County and is before us on a petition for a writ of prohibition filed by the Board of Trustees of the City of North Kansas City Hospital ("Board"). In September of 1986, the plaintiffs sued the City of North Kansas City ("City") and the individual members of the Board.[1] The complaint alleges medical malpractice in the performance of discograms.[2] The complaint also alleges negligence in the supervision of discograms, in the lack of procedures for safely conducting this test, and in the use of the test at all. All of the allegations of negligence on the part of the hospital relate, in one way or another, to the provision of a medical service to the plaintiffs.

In April of 1987, the parties stipulated that the Board was the proper party to represent the hospital, rather than the City or the individual members of the Board. As a part of this stipulation, the Board agreed not to raise any defense that it was not the proper party. The City and the individual members of the Board were then dismissed from the case. The Board remains as the only representative of the hospital.

In November of 1991, the Board moved for summary judgment based upon sovereign immunity. Judge Russell denied that motion. The Board then sought a writ of prohibition from the Court of Appeals, Western District, to prohibit Judge Russell from continuing to exercise jurisdiction over the Board in this lawsuit. The court of appeals denied the petition for the writ.

## II. THE REMEDY OF PROHIBITION

The Board then sought the same writ from this Court. We granted a preliminary writ of prohibition to examine the

or into the discs separating those bones. The plaintiffs claim that the defendants in this case did not use sterile needles to inject the contrast medium and that, as a result, they contracted disc-space infections.

issue of sovereign immunity and now make our writ absolute. Because, as explained below, the Board is entitled to the protection of sovereign immunity, it is within this Court's discretion to issue a writ of prohibition. *See State ex rel. St. Louis Housing Authority v. Gaertner*, 695 S.W.2d 460 (Mo. banc 1985). Where a defendant has the defense of sovereign immunity, "prohibition is the appropriate remedy to forbear patently unwarranted and expensive litigation, inconvenience and waste of time and talent." *State ex rel. New Liberty Hospital District v. Pratt*, 687 S.W.2d 184, 187 (Mo. banc 1985). Where a defendant is clearly entitled to immunity, it is not necessary to wait through a trial and appeal to enforce that protection.

### III. STRUCTURE OF THE BOARD OF TRUSTEES

The Board argues that it is a public entity created by the legislature to operate a hospital owned by the City. Under the Board's analysis, it is entitled to sovereign immunity because it is an arm of the state, functioning separately from the City. The plaintiffs respond that the Board is not a public entity because it is neither created by the legislature nor subject to local control. Because it is not a public entity, the plaintiffs argue, the Board is not entitled to any protection from suit.

■ The parties to this dispute disagree as to whether the Board is a public or private entity, but, in framing the issue in this manner, they ignore the possibility that the Board is not an "entity" but rather a part of the City of North Kansas City. To determine whether the Board is actually entitled to sovereign immunity, we must first decide whether the Board is a cognizable entity at all. A careful examination of the Board and its relationship with the City reveals that it is not.

### A. The Statutory Scheme

A full understanding of the nature of the Board requires an understanding of the statutory framework under which the Board operates. North Kansas City Hospital was created under Chapter 96, RSMo, specifically sections 96.150, RSMo Supp. 1991, through 96.228.[3] The statute creating the predecessors to these sections was entitled "AN ACT to authorize cities of the third class to purchase, erect, lease, equip and maintain grounds and buildings for hospital purposes and to conduct and operate such hospital." 1921 Mo.Laws 46 (1st Extra Session). The act does not describe itself as creating an entity to run hospitals for cities that own them. Rather, the title shows that the act was intended to give third class cities a means of operating hospitals.[4]

Currently, Chapter 96 provides a mechanism for voters to petition for a tax to support a hospital. Section 96.150.1 provides that "[w]hen one hundred voters of any city of the third class shall petition the mayor and council asking that an annual tax ... be levied for ... a health care facility in such city ... the mayor and council shall submit the question to the voters." § 96.150.1, RSMo Supp.1991. The statute specifies that the form of the question shall be in substantially the following form:

> Shall there be .......... cent tax for .......... (establishment of, equipping, operating and maintaining) a .......... (hospital, nursing home, or convalescent home, etc.) in the city for the care and treatment of the sick, disabled and infirm?

§ 96.150.2 (Supp.1991). Upon a two-thirds vote, the tax is levied and set aside in a separate fund for the facility. § 96.150.3, RSMo Supp.1991.

Chapter 96 also includes provisions relating to the powers of boards of trustees.

---

**3.** All sections are RSMo 1986, unless otherwise noted.

**4.** Before this law was enacted, cities of the third class had the power to operate hospitals. § 8294 RSMo 1919. In fact, cities of the third class have had the power to operate hospitals since the first law classifying cities was enacted in 1877. See 1877 Laws Mo. 165 § 21. Through amendments and reenactments that effected only minor changes, this law adopted in 1877 continues in force today as section 77.530, RSMo.

Specifically, "[t]he trustees shall have authority to operate, maintain and manage a hospital and hospital facilities, and to make and enter into contracts ...; to make and enter into leases [with some limitations] ...; and further to provide rules and regulations for the operation, management or use of a hospital...." § 96.150.5 RSMo Supp.1991. Nowhere in Chapter 96 is a board granted a corporate or political existence, perpetual succession, or existence after dissolution of its city. Neither is a board granted the power to sue and be sued, to tax, to issue bonds, or to hold property except as "special trustees."

The structure of a Chapter 96 board of trustees requires a close relationship between a board and its city. The members of a board are subject to control of the city because membership on the board depends upon selection by the city government. The members of a board are selected by the mayor with the approval of the council. § 96.160. The members of a board may be removed for any of the reasons listed in the statute upon a majority vote of the council. § 96.175. Even the size and composition of a board may, within limits, be varied by the city council. § 96.160. Furthermore, the funds of a Chapter 96 hospital are tied to the city. The tax is levied by the city following approval by the voters of the city. § 96.150.3. The tax is levied and collected in the same manner as other municipal taxes. *Id.;* § 96.220. Any bonds issued for the hospital are issued by the city, upon recommendation of the board. § 96.222. Although a board has control of the expenditures of funds to operate the hospital, the funds are kept in the city treasury. § 96.190. The funds are kept separate from other city monies, but the board must annually make a "detailed report to the city council, showing the receipts of all funds and the expenditures therefrom, and showing each donation and amount thereof." § 96.200.

### B. Comparison with Other Boards and Entities

That the Board is not an entity becomes clearer when the Board and Chapter 96 are compared with entities that have been recognized as such. The recent opinions of this Court contain examples of "public entities." *See, e.g., State ex rel. Regional Justice Information Service Commission v. Saitz,* 798 S.W.2d 705, 707 (Mo. banc 1990) (REJIS, created under authority of § 70.260); *State ex rel. Trimble v. Ryan,* 745 S.W.2d 672 (Mo. banc 1988) (Bi–State Development Agency, an interstate compact agency formed under authority of § 70.370); *State ex rel. St. Louis Housing Authority v. Gaertner,* 695 S.W.2d 460, 463 (Mo. banc 1985) (municipal housing authority created under Chapter 99); *State ex rel. New Liberty Hospital District v. Pratt,* 687 S.W.2d 184 (Mo. banc 1985) (hospital district created under Chapter 206). These diverse entities have varying and distinct powers appropriate to fulfill the purposes for which they were created. However, all of these entities share the common feature of enabling statutes that expressly grant them corporate existence. *See, e.g.,* § 70.260.2, RSMo Supp.1991 (REJIS, "a body corporate and politic"); § 70.-370, art. III (Bi–State, "a body corporate and politic"); § 99.080.1 (housing authority "shall constitute a municipal corporation" and have power "to have perpetual succession"); § 206.010.2 (hospital district "shall be a body corporate and political subdivision of state"). The Board, on the other hand, has no existence except through the continued existence of the City of North Kansas City.[5]

While the Board has some features in common with some of the entities in these cases, it lacks the fundamental feature of an existence separate and distinct from that of the City. Like the St. Louis Housing Authority, the Board is selected and may be removed by the city government. *See St. Louis Housing Authority,* 695

---

**5.** At oral argument, counsel for both parties argued that the Board and the hospital would continue to exist if the City were to dissolve. However, neither offered any authority for such a position. It appears that they are incorrect.

While the Board could continue the hospital as a private enterprise, they would no longer be acting under Chapter 96 if the City ceased to exist. The many statutory provisions tying the Board to the City allow no other conclusion.

S.W.2d 460. Like the New Liberty Hospital District, the Board operates a public hospital. *See New Liberty Hospital District,* 687 S.W.2d 184. But, both of these entities are specifically granted corporate existence and do not depend upon any other entity for their existence. It is this aspect of the entities involved in these previous cases that sets them apart from the Board in this case. Aside from the entities that have been before this Court in sovereign immunity cases, the statutes have other examples that provide useful comparisons.

The Board essentially argues that the legislature created the Board as an independent arm of the state, rather than a part of the City, for the sole purpose of running a hospital for the City. The legislature could have created such an entity, if it had wished. The law providing for hospital districts permits such an independent entity. *See* § 206.010.2. The statutes contain other examples of independent entities that might be created by the citizenry, such as the city library district, which "shall be a body corporate." § 182.140. Street light maintenance districts are "[t]o have perpetual existence." § 235.150. And if you create an ambulance district, it "shall be a body corporate and a political subdivision of the state." § 190.010. The legislature did not include any grant of separate existence when it enacted the original law providing for city hospitals in third class cities. Neither has it added such a grant in any of the amendments to the law. The most recent amendment occurred in 1987 and explicitly listed the authority of a Chapter 96 board of trustees but did not give the board any authority to have perpetual succession or to be a body corporate. *See*

§ 96.150.5, RSMo Supp.1991. Lacking any separate existence, the Board is not an entity but is a part of the City of North Kansas City.[6]

■ Not all of the statutes defining some part of government create "entities." Statutes similar to the sections in Chapter 96 grant authority for zoning commissions and boards of adjustment, §§ 89.070–89.090, park boards in third class cities, §§ 90.500–90.570, and boards to operate municipally owned utilities, §§ 91.270, 91.480. The statutes do not grant corporate existence or political subdivision status to these boards either. These statutes govern the operation of parts of city government in the same way sections 96.150 through 96.228 govern operation of the Board. The statutes granting authority to the Board are like the statutes setting forth the powers of the mayor and city council in third class cities. *See* §§ 77.060–77.360. A city council has no corporate existence either. Rather, the city has corporate existence. § 77.010. A city has the power to sue and be sued, while the city council does not.[7] *See id.* Thus the Board is not a "public entity" in its own right, but rather a part of the City, and, for purposes of sovereign immunity, the Board enjoys such immunity as the City would enjoy.

## IV. SOVEREIGN IMMUNITY

■ Because of the peculiar history of sovereign immunity in Missouri, a proper understanding of the current law requires a review of the past. The law of sovereign immunity was a common law doctrine applied, modified, and interpreted by the courts of Missouri until September 12, 1977. On that date, this Court prospective-

---

6. At the time the citizens of North Kansas City voted to impose a city hospital tax, the law providing for hospital districts had not yet been enacted. If the citizens wanted to, they could have voted to create a hospital district with boundaries coextensive with the city limits and had the Board transfer the hospital to the hospital district. Since 1961, however, citizens have had the option to create a hospital district under Chapter 206 rather than a city hospital run under Chapter 96. The procedures are similar, but the results are slightly different. Hospital

districts are not dependent upon city governments for their existence.

7. We need not reach the issue of whether the Board has the ability to sue and be sued apart from the City's powers. The City was previously a defendant in this case and, by stipulating that the Board was the proper party to defend the suit, agreed to allow the Board to conduct the suit on its behalf. Thus we do not decide the issue faced by the Court of Appeals in *Board of Trustees v. Conway,* 675 S.W.2d 36 (Mo.App. 1984).

ly abrogated the doctrine of sovereign immunity effective August 15, 1978. *Jones v. Missouri Highway Commission*, 557 S.W.2d 225 (Mo. banc 1977). The legislature responded by enacting sections 537.-600 through 537.650, which revived the immunity existing immediately prior to the *Jones* decision, with some modifications. More than once since enacting the statute, the legislature has amended it in response to judicial interpretation of sovereign immunity law. *See Wollard v. City of Kansas City*, 831 S.W.2d 200, 202 (Mo. banc 1992) (describing history of one such amendment). Now, issues of sovereign immunity require examination of the statute and reference to the pre-*Jones* common law.

## A. "Public Entity" Status as a Threshold

■ The first analytical step in our sovereign immunity cases has often been determining whether the defendant was a "public entity" under section 537.600, RSMo Supp.1991. *See, e.g., Stacy v. Truman Medical Center*, 836 S.W.2d 911 (Mo. banc 1992) (discussing certain factors for determining status of "hybrid" entities). In some cases this is a difficult determination because there are a number of "hybrid" entities that are not easily classified as public or private. In this case, however, we need not spend much effort. The City of North Kansas City would have been entitled to sovereign immunity prior to September 12, 1977, and is a public entity within the meaning of section 537.600. Thus, the City is entitled to the sovereign immunity afforded by the statute and the common law.

## B. The Statutory Exceptions

The next step is to examine whether the injury complained of falls within either of the two categories for which immunity is expressly waived by section 537.600, i.e., injuries arising from negligent operation of motor vehicles and dangerous conditions of property. If the injury falls within these categories, the defendant is not immune. Liability is capped at $100,000 per injured person by the statute, however, regardless of whether the defendant would have been immune prior to the adoption of sections 537.600–537.650. *See Wollard*, 831 S.W.2d 200. The injuries alleged in this case do not fall within these categories, nor do the parties argue that they should.

## C. The Governmental/Proprietary Distinction

■ When, as in this case, the defendant is a municipality, the analysis focuses on the activity giving rise to the injury to determine whether the activity was an exercise of a governmental or a proprietary function. The question is significant because, before September 12, 1977, municipalities did not enjoy complete sovereign immunity. Rather, they were immune from liability arising from their governmental activities but were not immune from liability arising from their proprietary activities.[8]

The statutes and amendments enacted by the legislature have modified the governmental/proprietary distinction to a certain extent, as recently explained by this Court. *See Wollard*, 831 S.W.2d 200. In *Wollard*, we determined that the governmental/proprietary distinction was irrelevant within the areas covered by section 537.600, i.e., negligent operation of motor vehicles and dangerous conditions of property. As we noted in that case, "[t]he common law governmental/proprietary test retains vitality only in suits against municipal corporations that do not involve the express waivers contained in § 537.600." *Wollard*, 831 S.W.2d at 203. The 1985 amendment we considered in *Wollard* by its very terms only covers those express waivers. Therefore, we conclude, as in *Wollard*, that the governmental/proprietary distinction re-

---

8. There is some confusion in the cases as to whether this governmental/proprietary distinction applies to any public entities other than municipalities. It may be that prior to September 12, 1977, the distinction applied to school districts also. *See State ex rel. Allen v. Barker*, 581 S.W.2d 818 (Mo. banc 1979); but see REJIS, 798 S.W.2d at 707, and *Wollard*, 831 S.W.2d at 203. Because the defendant here is a municipality, the distinction applies, and we need not determine whether it would apply in other cases.

mains in effect for municipalities with respect to any tort not within the areas covered by sections 537.600.1 and 537.600.2.[9]

### D. Hospitals are Governmental

 The alleged negligence in this case arose from the provision of medical services in a city hospital. The operation of a hospital by a city ·has traditionally been held to be governmental. *See, e.g., Schroeder v. City of St. Louis*, 228 S.W.2d 677 (Mo.1950); *Zummo v. Kansas City*, 285 Mo. 222, 225 S.W. 934. That a hospital is governmental has been so well settled that in recent cases no detailed explanation has been necessary and the bare citation of authority has been sufficient support for the proposition. *See, e.g., New Liberty Hospital District*, 687 S.W.2d at 486. The plaintiffs do not offer any arguments sufficient to change this conclusion.

The plaintiffs argue that the operation of this particular hospital is a proprietary function of the City. They offer to show that the hospital has a substantial advertising budget designed to attract private patients, that the hospital has a surplus of revenue over expenses, and that the hospital has assets of $133 million compared to liabilities of only $9 million. Essentially, the plaintiffs argue that the Board competes with private hospitals and makes money doing it.

 The plaintiffs' point about competition is well-taken, but not dispositive. It may not be entirely fair for the City to compete with private companies in providing health services. However, the City also provides police protection in competition with private security companies. Further, laying out, building, and maintaining city streets are proprietary functions, but ones in which cities have no competition. Mere competition with private enterprise is insufficient to divest an activity of its governmental character. Nor does the absence of competition prevent a city's actions from being proprietary.

 The plaintiffs' arguments regarding the revenues and assets of the hospital are less persuasive. In the past, we have noted that a patient paying for services in a hospital does not change the governmental character of the hospital. *See New Liberty Hospital District*, 687 S.W.2d at 186 (*citing Schroeder*, 228 S.W.2d at 678). In 1954, the people of North Kansas City voted on the measure to impose the hospital tax under section 96.150. In 1958, after another vote to authorize a bond, the hospital finally began operation. The plaintiffs do not claim or offer to prove that the hospital was formed with the intention of making money. Rather, they assert that there has been a surplus of revenue over expenses in fiscal years ending in 1989 and 1990. The fact that a city hospital brings in more than it spends in a given fiscal period does not strip it of its governmental character.

 In examining the question of whether an activity is governmental or proprietary, the nature of the particular defendant's conduct is often less important than the generic nature of the activity. Rather than examining the motives of the city employees who were performing the function, the analysis focuses on the motives of the legislature that conferred the power upon all municipalities. Why the City is operating this hospital now is less relevant than why the state allows cities of the third class the power to operate hospitals and why cities would want to have hospitals at all. Even if the sole motivation of the city government were profit, the hospital would still be governmental. The status of a function of a city does not vary from day to day with the whims of the particular people elected or appointed to municipal offices. The generic fact that cities begin hospitals to provide health care to the people and the historic fact that Chapter 96 is an effort to allow cities to provide health care amply support the conclusion that the operation of a city hospital is a governmental function.

**9.** Because we conclude that this suit arises from the exercise of a governmental function, we need not reach the issue of whether the liability cap of section 537.610.2 is applicable to a proprietary function not falling within the scope of the two statutory exceptions.

### E. Insurance as a Waiver of Immunity

The final steps of the analysis involve liability insurance. Even when public entities have full sovereign immunity, they may waive that immunity through the purchase of insurance, as provided in section 537.610. Similarly, municipalities are specifically granted the power to purchase liability insurance by section 71.185, but, as in section 537.610, the purchase of such insurance may waive immunity. Thus, an analysis of a defendant's immunity requires inquiry into the questions of whether there is insurance and whether the insurance waives immunity under the appropriate statutes. In this case, there is some insurance, and we must determine whether the Board waived immunity by purchasing it.

First, section 537.610 permits political subdivisions of the state to purchase insurance and thus waive sovereign immunity. In this case, the Board had purchased a pair of insurance policies with identical coverage; one was a principal policy and the other an "umbrella" policy. The principal policy includes an endorsement that explicitly disclaims coverage for "ANY CLAIM BARRED BY THE DOCTRINES OF SOVEREIGN IMMUNITY OR OFFICIAL IMMUNITY, EXCEPT ATTORNEY'S FEES AND OTHER LITIGATION COSTS INCURRED IN DEFENDING A CLAIM. *NOTHING CONTAINED IN THIS POLICY (OR THIS ENDORSEMENT THERETO) SHALL CONSTITUTE ANY WAIVER OF WHATEVER KIND OF THESE DEFENSES OF SOVEREIGN IMMUNITY OR OFFICAL [SIC] IMMUNITY FOR ANY MONETARY AMOUNT WHATSOEVER.*" Exhibit E5 to petition for writ of prohibition (emphasis added). The endorsement also provides that it does cover "claims that arise out of the two perils specifically described in Section 537.600 R.S.Mo." *Id.* We recently decided that a similar policy, purchased by a county hospital, did not constitute a waiver of sovereign immunity under section 537.610. *See State ex rel. Cass Medical Center v. Mason,* 796 S.W.2d 621 (Mo. banc 1990). Nothing in this case offers any reason to treat this policy any differently from the one in *Cass Medical.*

Second, municipalities may purchase insurance and, by doing so, waive the sovereign immunity that protected them in the exercise of governmental functions. § 71.185. This statute predates section 537.610 by several years, and, as under the new section, immunity is waived only "to the extent of the insurance" purchased. *Id.* The language of section 71.185 differs from that in section 537.610, but the differences are not material in this case. The endorsement disclaiming coverage of any claim barred by the doctrine of sovereign immunity avoids any waiver of sovereign immunity in this suit. The Board did not waive its sovereign immunity.

The preliminary writ of prohibition is made absolute.

All concur.