Linda CONWAY, et al.,
**Plaintiffs/Appellants,**

v.

**ST. LOUIS COUNTY, MO, et al.,
Defendants/Respondents.**

No. ED 90326.

Missouri Court of Appeals,
Eastern District,
Division Three.

April 1, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 15, 2008.

Application for Transfer Denied
June 24, 2008.

Rick A. Courtney, Florissant, MO, for appellant.

Michael A. Shuman, Clayton, MO, for respondent.

CLIFFORD H. AHRENS, Judge.

Linda Conway ("mother") and Davis Conway, as personal representative of the estate of Davis Michael Conway[1] (collectively referred to herein as "plaintiffs"), appeal the judgment of the trial court granting summary judgment in favor of St. Louis County[2], The City of Winchester,

---

1. Davis Michael Conway was originally named as a plaintiff. Upon his death, the personal representative of his estate was substituted as a party.

2. In their brief, plaintiffs affirmatively abandon their appeal concerning the grant of summary judgment in favor of St. Louis County. Plaintiffs also abandon their appeal concerning their claims in counts five through eight

Jeffery Burk, Stephen Trentham, Mary Barton, Scott Johnston, Stephen Nagle, and Richard Muehlenbeck (collectively referred to herein as "defendants"), on their action resulting from the death of Jonathan Conway ("decedent"). Plaintiffs claim the court erred in granting summary judgment in favor of defendants because their claims were not barred by res judicata and the defendants were not protected by official immunity as a matter of law. In addition, plaintiffs claim the court erred in granting summary judgment because there were genuine issues of material fact. Finally, plaintiffs claim summary judgment in favor of The City of Winchester ("Winchester") was improper because Winchester was answerable on principles of ordinary negligence. Finding no error, we affirm.

On May 12, 2003, mother and decedent, who lived with mother, discussed plans for the day. Mother informed decedent his niece, the daughter of decedent's brother Davis, would be visiting, and decedent became depressed and upset. Decedent suffered from depression, agoraphobia, panic attacks, and learning disabilities. He was under the care of a psychiatrist at the time. Decedent told mother he might as well hang himself and told her he was going to buy a rope to do so. Decedent went into his bedroom upstairs. Mother followed decedent to his room and said his niece did not have to come over and mother would spend the day with him. Mother went downstairs and called her son Davis to tell him not to bring his daughter over to visit. She told Davis decedent was having a bad day and threatened to hang himself. Davis placed an emergency call to 911 requesting that police check out the situation at the residence. The 911 opera-

tor subsequently contacted emergency personnel. Officer Trentham and Sergeant Burk responded to the call. They arrived at mother's residence shortly after the dispatch. Prior to their arrival, the 911 operator called mother. Mother informed the 911 operator that decedent had calmed down and had not tried to hurt himself or mother. A subsequent dispatch went out informing the officers that the situation was calming down. Neither Officer Trentham nor Sergeant Burk recalled receiving the subsequent dispatch.

Mother called Dr. Kevin Miller, decedent's psychiatrist. Dr. Miller instructed mother to take decedent to the hospital to be examined by a physician. During this telephone conversation, Officer Trentham and Sergeant Burk arrived at mother's residence. Office Nagle also arrived at the residence in a separate vehicle. Officer Trentham and Sergeant Burk entered the home. Officer Nagle remained outside in the back of the house. Mother went upstairs and discovered the door to decedent's room was closed and locked. She spoke to him through the door and told him the police and paramedics were at the house. Decedent told mother to tell them to leave. Mother told the police officers this, but they refused to leave. A paramedic also attempted to persuade decedent to leave his room, but the attempt failed. Sergeant Burk went to decedent's door and identified himself. Decedent told Sergeant Burk he was "fine," and Sergeant Burk responded decedent needed to open the door because the officers needed to see decedent. Decedent refused to open the door and asked the officers to leave. Sergeant Burk informed decedent if he did not come out of his room they would have to enter the room to make sure he was

of their petition, which were based upon an alleged breach of the police services contract,

except as those claims relate to Winchester.

okay. Decedent said if the officers entered the room he would stab them. The officers subsequently learned decedent had a sword in his room. Sergeant Burk returned downstairs and called for a ballistics shield. Sergeant Johnston and Lieutenant Barton heard the call for the shield and separately went to mother's residence. Officer Muehlenbeck had also arrived at the house. Sergeants Burk and Johnston and Officer Trentham went upstairs with the shield and a "less lethal" beanbag shotgun. Officer Muehlenbeck was also positioned to enter decedent's room. Sergeant Johnston kicked open decedent's room. The officers entered the room and saw decedent had a sword in one hand and another object in his other hand[3]. The officers testified that decedent was swinging the sword and moved toward them when they entered the room. Sergeant Johnston discharged the beanbag shotgun in an attempt to subdue decedent. According the testimony of the officers, decedent continued to move toward them swinging the sword. Ultimately Officer Trentham and Sergeant Burk opened fire with their .40 caliber pistols and shot decedent. Decedent died from gunshot wounds to the abdomen.

As a result of decedent's death, plaintiffs filed suit for wrongful death based upon 42 U.S.C. section 1983 in the United States District Court, Eastern District of Missouri. This action was filed against Jeffery Burk, Stephen Trentham, Mary Barton, Scott Johnston, Stephen Nagle, and Richard Muehlenbeck (collectively referred to herein as "police defendants"), as well as other police personnel. The petition alleged counts of illegal entry and refusal to leave, excessive use of force, failure to properly supervise, conspiracy,

intentional or reckless infliction of emotional distress upon mother, as well as other claims against the various police personnel named as defendants. The federal court entered judgment in favor of all defendants and dismissed plaintiffs' claims under 42 U.S.C. section 1983 for alleged violations of state law with prejudice for failure to state a claim. The court also dismissed "plaintiffs' claims seeking supplemental relief for alleged violations of state law" without prejudice pursuant to 28 U.S.C. section 1367(c)(3). Plaintiffs subsequently brought an action against defendants in the Circuit Court of St. Louis County. This petition alleged counts of wrongful death, intentional or reckless infliction of emotional distress, failure to properly supervise, civil conspiracy, breach of contract by the police defendants, negligence, respondeat superior, and breach of contract by St. Louis County and Winchester. Defendants moved for summary judgment. The court found defendants were entitled to judgment as a matter of law and entered judgment granting defendants' motions. Plaintiffs now appeal.

Pursuant to Missouri Supreme Court Rule 74.04(c)(6), the trial court shall grant summary judgment if "the motion, the response, the reply and the sur-reply show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . ." Our review of the trial court's grant of summary judgment is *de novo*. *Blue v. Harrah's North Kansas City, LLC,* 170 S.W.3d 466, 478 (Mo.App.2005); (citing *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993)). We view the record in the light most favorable to the party against whom judgment was entered. *Id.*

---

**3.** The officers later discovered the unidentified object was the empty scabbard for the sword.

We give the non-movant the benefit of all reasonable inferences from the evidence. *Id.* As defending parties, defendants are entitled to summary judgment if they can show facts that negate any element of a cause of action or if they can show there is no genuine dispute as to the existence of facts necessary to support a properly pleaded affirmative defense. *Id.* Plaintiffs must show a genuine dispute as to the facts underlying defendants' right to judgment on either ground. *Id.* "If the parties disagree on the legal effect and consequences of the facts, and not the relevant facts themselves, there is not a genuine dispute of facts precluding summary judgment." *Id.* (citation omitted).

■ In addition, if the trial court fails to specify the grounds upon which it granted summary judgment, we will affirm the grant of summary judgment if it is proper under any theory supported by the record and presented on appeal. *Blue,* 170 S.W.3d at 478. Here, the trial court simply granted defendants' motions for summary judgment without explanation; therefore, we must determine only whether any theory in the record supports the grant of summary judgment to affirm the judgment of the trial court.

Because the trial court failed to state the reasons it granted summary judgment in favor of defendants, plaintiffs addressed each argument set forth in defendants' motions for summary judgment on appeal. Several of plaintiffs' points on appeal concern the doctrines of res judicata, collateral estoppel, and official immunity, all of which were asserted as grounds for summary judgment in favor of defendants. Plaintiffs' final point on appeal concerns summary judgment in favor of Winchester. In the interest of clarity, we address points four and five first.

■ Point four on appeal concerns the propriety of summary judgment in favor of the police defendants based upon the doctrine of official immunity. Plaintiffs claim the trial court erred in granting summary judgment in favor of the police defendants on plaintiffs' claims of wrongful death, failure to properly supervise, and civil conspiracy[4].

Defendants properly pleaded the affirmative defense of official immunity in their answer to the claims of wrongful death and failure to properly supervise. Therefore, we must consider whether there is a genuine dispute as to the existence of facts necessary to support this properly pleaded affirmative defense.

■ Official immunity provides protection to public officials from liability for negligence related to the performance of their discretionary acts. *Davis v. Lambert–St. Louis Intern. Airport,* 193 S.W.3d 760, 763 (Mo. banc 2006). Official immunity is designed to protect individual public officers who, despite imperfect information and limited resources, must exercise discretion in performance of their duties. *Id.* at 765. A discretionary act requires the exercise of reason and discretion in determining how an act should be done or what course should be pursued. *Id.* at 763. A ministerial function is one which is merely clerical in nature and required to be performed without regard to the officer's judgment or opinion concerning the propriety of the act to be performed. *Id.* "When an officer is responding to an emergency, however, the officer exercises judgment and discretion and is entitled to official immunity." *Id.*

Here, the officers were responding to a 911 emergency call made by mother's son

---

**4.** Plaintiffs affirmatively abandon their claims on appeal concerning the count of breach of contract and an alternative claim of negligence against the police defendants.

Davis. Upon arrival at mother's residence, the officers were required to exercise discretion concerning what course of action to pursue. Faced with an individual locked in his room, with information that this individual threatened to kill himself before their arrival, Sergeant Burk determined the officers needed to see decedent. When Sergeant Burk informed decedent of this fact, he threatened to stab the officers if they entered the room. The officers were informed that decedent did, in fact, have a sword in his room. The police defendants exercised their judgment in determining how to enter decedent's room to respond to the potential threats based upon the information they were given. Although the results of this exercise of discretion were tragic, to impose liability upon the officers in such cases may adversely affect officers or citizens in need of emergency assistance in the future. *Davis*, 193 S.W.3d at 763.

■■■■ There are certain exceptions to official immunity for discretionary acts performed in bad faith or with malice. *Blue*, 170 S.W.3d at 479. "Bad faith or malice generally requires actual intent to cause injury." *Id.* Bad faith signifies a dishonest purpose or conscious wrongdoing or breach of a known duty through ulterior motives or ill will. *Id.* It requires actual intent to mislead or deceive another. *Id.* Malice also requires intent. *Id.* To act with malice, the officer must do that which a man of reasonable intelligence would know to be contrary to his duty and intend such action to be injurious to another. *Id.* Here, there is no evidence in the record of any intentional wrongdoing on the part of police defendants, nor is there any evidence of ulterior motives or ill will. The only evidence is that the officers exercised their discretion in determining how best to respond to the 911 emergency call regarding decedent once they arrived at mother's residence, given the circumstances they faced at the time. Thus, there is no genuine dispute about whether the police defendants acted in bad faith, thereby precluding protection from official immunity.

Here, there is no dispute that the police defendants were acting in a discretionary manner and without the requisite intent to have acted in bad faith or with malice. Therefore, the police defendants were entitled to official immunity, and summary judgment was proper.

■■■■ With respect to the claim for civil conspiracy, the police defendants did not plead official immunity as an affirmative defense in their answer to plaintiffs' claims. However, a claim for civil conspiracy is not actionable alone absent an underlying tort. *State ex rel. Diehl v. Kintz*, 162 S.W.3d 152, 156 (Mo.App.2005). Since plaintiffs' claims for wrongful death and failure to supervise fail based on the doctrine of official immunity, the claim for civil conspiracy must also fail. *Id.*

Based upon the record before us, there is no genuine dispute as to the existence of facts necessary to support the police defendants' properly pleaded affirmative defense of official immunity. Therefore, the trial court did not err in granting summary judgment in favor of the police defendants on the claims of wrongful death, failure to properly supervise, and civil conspiracy. Point denied.

■■■■ In their fifth point on appeal, plaintiffs claim the trial court erred in granting summary judgment in favor of the police defendants on mother's claim for intentional or reckless infliction of emotional distress. There is no evidence in the record to support such a claim.

■■■■ Intentional infliction of emotional distress requires the defendant to act intentionally or recklessly, the conduct

must be extreme and outrageous, and the conduct must be the cause of extreme emotional distress that results in bodily harm. *Thomas v. Special Olympics Missouri, Inc.*, 31 S.W.3d 442, 446 (Mo.App. 2000). Wrongful conduct alone cannot serve as a basis for the tort, but instead, the conduct must have been so outrageous and extreme as to go "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.; (quoting Gibson v. Brewer,* 952 S.W.2d 239, 249 (Mo. banc 1997)). In addition, it is essential that the conduct be intended only to cause emotional distress to the victim. *Id.* As noted above, there is no genuine issue of material fact regarding whether the police defendants acted with sufficient intent to harm to support a claim of intentional infliction of emotional distress. Moreover, there is no evidence to support the conclusion that the actions of the police defendants were intended solely to cause emotional distress to mother.

In addition, to the extent mother's claim could be construed as negligent infliction of emotional distress, our analysis of the official immunity doctrine as it applies to the claims of wrongful death and failure to properly supervise applies equally to warrant summary judgment on mother's claim against police defendants for any negligent infliction of emotional distress. Police defendants are protected by the doctrine of official immunity from tort liability regarding any potential emotional distress negligently inflicted upon mother as a result of this heart-breaking incident. Thus, the trial court did not err in granting summary judgment on mother's claim for intentional or reckless infliction of emotional distress. Point denied.

In their first three points on appeal, plaintiffs claim the trial court erred in granting summary judgment based upon principles of res judicata and collateral estoppel. Plaintiffs' first point specifically raises a threshold question of whether defendants made a proper prima facie showing under Rule 74.04 that they are entitled to judgment as a matter of law because of defendants' reliance on a federal court memorandum. However, because defendants are entitled to summary judgment based upon the doctrine of official immunity, as discussed above, we need not consider plaintiffs' claims on appeal concerning res judicata or collateral estoppel as improper grounds for summary judgment.

We now turn to plaintiffs' final point on appeal concerning summary judgment in favor of Winchester. In their sixth point, plaintiffs claim the trial court erred in granting summary judgment in favor of Winchester because the actions of the police defendants were performed pursuant to a police services contract, and therefore, Winchester is liable to plaintiffs for ordinary negligence.

As plaintiffs correctly note, municipal immunity is limited to governmental functions, or those performed for the common good. *Jungerman v. City of Raytown,* 925 S.W.2d 202, 204 (Mo. banc 1996). A municipality is not immune for torts committed while performing proprietary functions. *Id.* Proprietary functions are those performed for the special benefit or profit of the municipality as a corporate entity. *Id.*

Pursuant to section 70.800 RSMo (2000)[5], Winchester is required to maintain a police department and may contract with another city, town, village, or the county for twenty-four hour per day police service. Plaintiffs argue section 70.800 is central to the question of Winchester's im-

---

**5.** All further statutory references are to RSMo (2000) unless otherwise noted.

munity, and they claim Winchester's decision to contract for police services is one made based upon economic motives which results in a finding that the decision is proprietary. We disagree.

 "Keeping the peace, enforcing laws and ordinances, and preserving the public health are just some of the duties within the province of a municipality as a governmental agency and upon which the municipality acts without liability." *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo.App.2007). There is no evidence in the record to indicate that Winchester's provision of police services by contract was motivated by economic factors. Instead, the provision of police services to the people of the municipality clearly falls within the realm of "[k]eeping the peace," and "enforcing laws and ordinances." Thus, contracting to provide police services is a governmental function from which Winchester is immune from liability absent a specific exception or waiver. *Id.*

Section 537.600 RSMo (Cum.Supp.2005) provides express waiver of sovereign immunity for injuries resulting from a public employee's negligent operation of a motor vehicle within the course of employment and for injuries caused by the dangerous condition of a public entity's property. Neither of these exceptions to sovereign immunity applies to Winchester in this case.

 In addition, we note that pursuant to section 537.610.1, the state or its political subdivisions can waive sovereign immunity to the extent of coverage for liability insurance. Here, Winchester did participate in a self-insurance program called Missouri Intergovernmental Risk Manage-

ment Association ("MIRMA"). However, the Missouri Supreme Court has determined that where the insurance policy includes a disclaimer concerning the waiver of sovereign immunity, it has not been waived under section 537.610.1. *State ex rel. Bd. of Trustees of City of North Kansas City Memorial Hosp. v. Russell,* 843 S.W.2d 353, 360 (Mo. banc 1992). Here, the insurance policy maintained by Winchester contained a clause entitled "Sovereign Immunity," which specifically stated:

> The coverage provided by this protected self-insurance plan does not apply to any claim or 'suit' which is barred by the doctrines of sovereign immunity as official immunity although defense of such actions shall be provided. No provision of this condition of coverage, or the coverage outline in which it is included, shall constitute a waiver of MIRMA's right or the right of any protected self insured to assert a defense based on the doctrines of sovereign immunity or official immunity.

The court in *Russell* determined that a similar policy provision did not constitute a waiver of sovereign immunity. *Id.* at 360. Therefore, the sovereign immunity provision in Winchester's policy does not constitute a waiver of sovereign immunity under section 537.610 [6].

Winchester was performing a governmental function in providing police services to its citizens, and therefore was entitled to immunity for the actions of the police defendants. There was no evidence to show an exception or waiver existed to defeat Winchester's sovereign immunity. Therefore, the trial court did not err in granting summary judgment in favor of Winchester. Point denied.

---

**6.** The court in *Russell* also considered the application of section 71.185 which does not expressly waive sovereign immunity for municipalities carrying liability insurance. The court concluded that the language of section 71.185 differs from that in section 537.610; however, the differences were not material to the case because of the disclaimer.

The judgment of the trial court is affirmed.

ROY L. RICHTER, P.J., and GLENN A. NORTON, J., concur.