**NORTH KANSAS CITY HOSPITAL BOARD OF TRUSTEES,**
Respondent,

v.

**ST. LUKE'S NORTHLAND HOSPITAL, Appellant.**

No. WD 54167.

Missouri Court of Appeals,
Western District.

Nov. 3, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 22, 1998.

Application for Transfer Denied
Feb. 23, 1999.

Allan V. Hallquist, Peter Sloan, David L. Rein, Jr., Blackwell Sanders Matheny Weary & Lombardi, Kansas City, for appellant.

William E. Quirk, Shughart Thomson & Kilroy, W. James Foland, Foland & Wickens, Kansas City, respondent.

Before ELLIS, P.J., and LOWENSTEIN and RIEDERER, JJ.

ELLIS, Presiding Judge.

On July 31, 1996, James M. Brophy, president and chief executive officer of St. Luke's Northland Hospital, sent a letter to the North Kansas City Hospital Board of Trustees making 24 different requests for documents under Missouri's Sunshine Law §§ 610.010 to 610.032.[1] The specific information requested is reflected in Appendix A at the end of this opinion. Generally, the requested documents related to (1) the Board of Trustee's involvement in a condemnation proceeding between St. Luke's and the city of Smithville over St. Luke's Smithville campus and (2) the general operation of North Kansas City Hospital and "related entities."

On August 6, 1996, Michael E. Payne, President of NKC Hospital, as custodian of all hospital records, sent St. Luke's a letter granting access to some of the requested documents but denying a majority of the requests. The substantive contents of that letter appear in Appendix B at the end of this opinion. The letter generally asserted that access to the records was denied pursuant to § 610.010 *et. seq.* On August 7, 1996, the Board of Trustees filed an action in the Circuit Court of Clay County requesting a declaratory judgment validating its refusal of access to St. Luke's. Specifically, the Board asked the court to find (1) that NKC Hospital itself was not a "public governmental body;" (2) that certain requested records were not "public records;" and (3) that the actions of the Board in closing the records were proper. The Board also requested an award of attorneys' fees and any other relief that the court deemed just and proper.

The trial court heard the cause on January 16, 1997. At that time, the Board delivered the requested documents to the court for *in camera* review. At some point prior to the entry of judgment, the Board provided St. Luke's with access to further documents relating to the Smithville campus in response to certain requests. On February 21, 1997, the trial court entered a declaratory judgment in favor of the Board. The court found: (1) The Board and NKC Hospital are distinct entities and that NKC Hospital is not a public governmental agency. Accordingly,

---

1. All statutory references are to RSMo 1994 unless otherwise noted.

the court found that those documents which are records of NKC Hospital, not the Board, are not public records; (2) Meritas Health Corporation and any other "related entities" are not quasi-public governmental entities under the Sunshine Law. Accordingly, the Trustees did not have to reveal any documents, contracts, or agreements with any related entity, including but not limited· to Meritas and Creekwood Ambulatory Surgery Center; (3) Many of the records requested by St. Luke's were properly closed because they were protected from disclosure by law under Missouri and U.S. antitrust statutes, the Missouri Trade Secrets Act, common law relating to trade secrets and the Constitutional right to privacy. Based on these findings, the trial court held that the Board had fully complied with the provisions of the Sunshine Law.

In its first point, St. Luke's claims the trial court erred in finding that NKC Hospital was not a "public governmental body" and that the documents retained by the hospital were therefore not "public records." While conceding that it is itself a public governmental body, the Board of Trustees maintains that the hospital is a separate entity, that the operation of a hospital is not governmental, and that the hospital's records are not subject to the provisions of the Sunshine Law.

The trial court accepted the Board's arguments, expressly finding that the Trustees do not control the day-to-day operation of NKC Hospital, hire physicians or nurses, enter into managed care contracts, hire consultants, or take care of sick people. The court found that these were things that NKC Hospital does as a separate entity in day-to-day operation of the hospital. The court found that the documents related to the day-to-day operation of the hospital do not "rise to the level" of the Board of Trustees, and were therefore not "retained by or of" the Board of Trustees. The trial court found that North Kansas City Hospital was a separate entity from the Board of Trustees that does not "govern" anyone or anything, does not operate as a legislative or administrative governmental body, and is not deliberative in nature. The court found that the hospital does not have rule-making power and it is not quasi-judicial. Based on these findings, the trial court concluded that North Kansas City Hospital was not a "public governmental body" and its records were not subject to the Sunshine Law.

Both the trial court and the Board rely heavily on *Tribune Publishing Co. v. Curators of the Univ. of Missouri*, 661 S.W.2d 575 (Mo.App. W.D.1983), for the proposition that the governing board of an institution and the institution itself are separate entities and that the institution itself is not a public governmental body. Their reliance is misplaced. *Tribune* is readily distinguishable. *Tribune* held that the Board of Curators of the University of Missouri is *sui generis* and by the mandate found in Article IX, § 9(a) of the Missouri Constitution, is a separate entity from the university itself. *Id.* at 579. The constitutional mandate significantly differentiated the Board of Curators from a normal corporate board of directors. *Id.* No such constitutional mandate comes into play with regard to the Board of Trustees of North Kansas City Hospital. Furthermore, in determining that the university itself was not a public governmental body, the *Tribune* court construed a definition of "public governmental body" from an earlier version of the Sunshine Law which did not encompass administrative governmental entities. *Tipton v. Barton*, 747 S.W.2d 325, 329 (Mo.App. E.D. 1988). Since *Tribune*, the Legislature has amended the Sunshine Law to, among other things, expand the definition of "public governmental body" to specifically include administrative or executive bodies. *Id.*

Section 610.010(4) currently provides that a "public governmental body" is:

[A]ny legislative, administrative or governmental entity created by the constitution or statutes of this state, by order or ordinance of any political subdivision or district, judicial entities when operating in an administrative capacity, or by executive order, including ... [a]ny department or division of the state, of any political subdivision of the state, of any county or of any municipal government, school district or special purpose district including but not limited to sewer districts, water districts,

and other subdivisions of any political sub-division.

■ The city of North Kansas City is clearly a public governmental body within the provisions of § 610.010(4), and the Board of Trustees readily concedes that it is itself a public governmental body. However, the Board contends, and the trial court agreed, that the hospital is a separate entity that has an existence of its own and is not a public governmental body. We disagree. It is conceded that NKC Hospital is a Chapter 96 hospital. As such, it is not a separate entity from its creator city. *Younger v. Missouri Pub. Entity Risk,* 957 S.W.2d 332, 338 (Mo. App. W.D.1997) (citing *State ex rel. Bd. of Trustees of North Kansas City Mem'l Hosp. v. Russell,* 843 S.W.2d 353, 357 (Mo. banc 1992)). The city's operation of a municipal hospital is a governmental function just like any other action of the city and there is no reason to distinguish a city hospital as a separate entity from the city. *Id.* at 337–38 (citing *Zummo v. Kansas City,* 285 Mo. 222, 225 S.W. 934, 937 (Mo.1920)).

The Board of Trustees is merely a part of the city government (just like the mayor, the city council, zoning commissions, boards of adjustment, park boards, and boards created to operate municipally owned utilities) created by statute to provide the city with a means of operating its hospital. *Russell,* 843 S.W.2d at 357.[2] The Board has the authority to operate, maintain and manage a hospital; to make and enter into contracts, for the use, operation or management of the hospital; to make and enter into leases of equipment and real property; and to provide rules and regulations for the operation, management or use of the hospital. § 96.150.5. The employees of

the hospital are city employees. *Younger,* 957 S.W.2d at 338. To the extent the Board of Trustees does not conduct the "day-to-day operations" of the hospital, that function is performed by a city employee who has been granted the authority to do so by the Board.

■ A "public record" under the Sunshine Law is any record retained by any public governmental body. *City of Springfield v. Events Publishing,* 951 S.W.2d 366, 371 (Mo. App. S.D.1997). "The emphasis is not on the nature of the document, but on who prepared or retains the record." *Id.*

■ The Board operates the hospital for the city. *Russell,* 843 S.W.2d at 357. The Board appointed the President of NKC Hospital, a city employee, to be the custodian of the hospital's records.[3] Therefore, the President, the Board of Trustees and the city all have legal control over the hospital records. *Tipton,* 747 S.W.2d at 329. Accordingly, the records are "retained" by a public governmental body.[4] *Id.* As a result, the records of North Kansas City Hospital are public records under the Sunshine Law.

■ St. Luke's next challenges the trial court's determination that Meritas Health Corporation ("Meritas") is not a quasi-public governmental body subject to the Sunshine Law. Meritas was incorporated in January, 1993 under Chapter 355, the Missouri General Not For Profit Corporation Law. Meritas is wholly owned by the Board of Trustees. Meritas purchases physician groups, participates as a member in a managed care provider, and operates medical office facilities. Its articles of incorporation provide that it "shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the

2. The nature of the Board of Trustees of North Kansas City Hospital was thoroughly discussed in *Russell,* 843 S.W.2d at 355–56. The Supreme Court concluded that the Board of Trustees was not a separate entity from the city and was merely a part of the city government just like the mayor, the city council, zoning commissions, boards of adjustment, park boards, and boards created to operate municipally owned utilities. *Id.* at 357.

3. The Board of Trustees provided by resolution, "Whereas, Section 610.023.1, R.S.Mo., provides that a public governmental body is to appoint a custodian who is to be responsible for the main-

tenance of that body's records and the identity and location of the custodian is to be made available upon request ... Now, therefore, be it resolved: That the President of North Kansas City Hospital be and hereby is appointed custodian of the records of North Kansas City Hospital ..."

4. Consequently, even if the hospital were a separate entity from the Board of Trustees, since the documents in question are "retained by" the Board of Trustees, they qualify as "public records" under the Sunshine Law. § 610.010.6.

purposes of the Board of Trustees of North Kansas City Hospital." Under its bylaws, Meritas' nine member board of directors is to contain the Chairman, Vice Chairman, Secretary, and Treasurer of the North Kansas City Hospital Board of Trustees; the President of North Kansas City Hospital; the Vice–President of Finance of North Kansas City Hospital; and three more members elected yearly by the board of directors. Article XIII of the articles of incorporation provides that in the event of the dissolution of the corporation, all of the assets of the corporation shall be distributed to North Kansas City Hospital, or to the city of North Kansas City in the event that North Kansas City Hospital no longer exists. Meritas is headquartered at the hospital and its board of directors meets at the hospital. Meritas has occasionally entered into loan agreements with the Board of Trustees.

Section 610.010(4) provides that any quasi-public governmental body is considered a public governmental body for the purposes of the Sunshine Law. That section defines "quasi-public governmental body" as "any person, corporation or partnership organized or authorized to do business in this state under the provisions of chapter 352, 353, or 355, RSMo, or unincorporated association which ... [h]as as its primary purpose to enter into contracts with public governmental bodies, or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies." § 610.010(4)(f).

The trial court expressly found that Meritas did not have as its primary purpose entering into contracts with public governmental bodies. However, the trial court failed to address whether Meritas had as its primary purpose to engage primarily in activities carried out pursuant to an agreement with a public governmental body. Article VIII of Meritas' articles of incorporation provides that Meritas "shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the Board of Trustees of North Kansas City Hospital."

This provision evidences an "agreement" such as is contemplated by the statute, particularly in light of the fact that Meritas was incorporated, and is wholly owned, by the Board of Trustees, and its Board of Directors is dominated and controlled by the Board of Trustees. It clearly demonstrates that Meritas is "engaged primarily in activities carried out pursuant to an agreement" with the Board of Trustees, and consequently the city, both, as we have previously found, "public governmental bodies." Accordingly, we can only conclude that Meritas is a quasi-public governmental body under § 610.010(4)(f). *See Champ v. Poelker,* 755 S.W.2d 383, 391 (Mo.App. E.D.1988) (holding contract between a corporation and St. Louis County providing that the corporation would promote tourism and convention business in the county was sufficient evidence to infer that the corporation's business was to perform a public function pursuant to agreements with governmental bodies and consequently sufficient to find the corporation was a quasi-public governmental body); *See also Sarasota Herald–Tribune v. Community Health Corp.,* 582 So.2d 730, 734 (Fla.Dist.Ct.App.1991) (holding non-profit corporation similar to Meritas, which was created to further the interests of a public hospital, was subject to Florida's public records act). To hold otherwise would allow governmental bodies to delegate or "contract away" their duties or functions in order to avoid disclosure of what would otherwise be public records. *KMEG Television, Inc. v. Iowa State Bd. of Regents,* 440 N.W.2d 382, 385 (Iowa 1989).

In its next point, St. Luke's claims the trial court erred in finding that certain records were properly closed under § 610.021. The trial court found that many of the records requested by St. Luke's had been properly closed because they were protected by law from disclosure under Missouri and United States anti-trust statutes, the Missouri Trade Secrets Act, common law relating to trade secrets, and the Constitutional right to privacy.[5]

---

5. The trial court also found that the litigation and real estate exceptions were appropriately applied to close certain requested records. While St. Luke's challenged the trial court's rul-

ings relating to the litigation and real estate exceptions in its original brief, the Board of Trustees' response indicated that the requested documents to which these exceptions would have

■ Except as otherwise provided by law, all public records of public governmental bodies are to be open to the public for inspection and copying. § 610.011(2). "Chapter 610 embodies Missouri's commitment to open government and is to be construed liberally in favor of open government." *Missouri Protection & Advocacy Svcs. v. Allan,* 787 S.W.2d 291, 295 (Mo.App. W.D.1990). Section 610.021 authorizes public governmental bodies to close public records under certain situations. § 610.021. These exceptions to the Sunshine Law are to be strictly construed to promote the public policy of the state that meetings, records, votes, actions, and deliberations of public governmental bodies are to be open to the public. § 610.011(1). "Hence, public records must be presumed open to public inspection unless they contain information which clearly fits within one of the exemptions set out in § 610.021." *State ex rel. Missouri Local Gov't Retirement Sys. v. Bill,* 935 S.W.2d 659, 664 (Mo.App. W.D.1996).[6]

The trial court relied on § 610.021(14) which allows a public governmental body to close "[r]ecords which are protected from disclosure by law." § 610.021(14). The trial court found that many of the records requested by St. Luke's had been properly closed because they were protected by law from disclosure under Missouri and United States anti-trust statutes, the Missouri Trade Secrets Act, common law relating to trade secrets, and the Constitutional right to privacy.

The first documents which the trial court found were protected by law were records requested by St. Luke's containing pricing information, the disclosure of which the trial court found would violate both § 416.031.2 of Missouri's antitrust law and 15 U.S.C. §§ 1 and 2 of the Sherman Act. Accordingly, the court held that St. Luke's was barred from obtaining pricing information for NKC Hospital's services, the acquisition price of physician practices, the compensation packages of physician employees, the strategic plan of the hospital, the monthly financial statements, consultant information, insurance agreements, managed care contracts, or any other commercially sensitive information which could influence the quality or price of medical services to the consumer.

■ Even assuming, *arguendo,* that the applicable antitrust statutes can provide protection to documents by way of § 610.021(14), the record does not support a finding that those statutes are invoked by the facts at bar. Chapter 1 of the Sherman Antitrust Act makes illegal "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *Wine & Spirits Specialty, Inc. v. Daniel,* 666 S.W.2d 416, 417 (Mo. banc 1984) (quoting 15 U.S.C. § 1 (1976)). "A party alleging a violation of 15 U.S.C. § 1 must allege that (1) defendants contracted, combined or conspired among each other; (2) the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) the objects of and the conduct pursuant to the contract or conspiracy were illegal; and (4) plaintiff was injured as a proximate result of the conspiracy." *Johnston v. Norrell Health Care, Inc.,* 835 S.W.2d 565, 568 (Mo.App. E.D.1992) (citing *Defino v. Civic Ctr. Corp.,* 718 S.W.2d 505, 509 (Mo. App. E.D.1986)). In order to show an "agreement, combination or conspiracy in restraint of trade," a party must show either collaboration among competitors (horizontal restraint) or some combination in the "line of distribution" that restrained competition (verticle restraint). *Marc's Restaurant, Inc. v. CBS, Inc.,* 730 S.W.2d 582, 586 (Mo.App. E.D.1987) (citing *Nat'l Tire Wholesale, Inc. v. Washington Post Co.,* 441 F.Supp. 81, 87 (D.D.C.), *aff'd,* 595 F.2d 888 (D.C.Cir.1979)). In interpreting Chapter 1 of the Sherman Act, the United States Supreme Court has held:

applied had already been provided to St. Luke's. Both parties agree that these arguments are rendered moot.

**6.** "If a public record contains material which is not exempt from disclosure as well as material which is exempt from disclosure, the public governmental body shall separate the exempt and nonexempt material and make the nonexempt material available for examination and copying." § 610.024.1.

The distinction between unilateral and concerted action is critical here. Adhering to the language of § 1, this Court has always limited the reach of that provision to "unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy between *separate entities*.'" *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (emphasis in original). We have therefore deemed it "of considerable importance" that independent activity by a single entity be distinguished from a concerted effort by more than one entity to fix prices or otherwise restrain trade. *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of agreement. *Id.* at 760–761, 104 S.Ct. 1464; *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). *Fisher v. City of Berkeley*, 475 U.S. 260, 266, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). "Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization [under 15 U.S.C. § 2]." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). "Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." *Id.*

The Board of Trustees fails to identify how St. Luke's is acting in concert with anyone else in requesting information under the Sunshine Law. St. Luke's unilateral actions cannot run afoul of Chapter 1 of the Sherman Act. *Id.* Thus, the requested documents were not protected by 15 U.S.C. § 1.

■ The trial court also concluded that the requested documents containing pricing information were protected from disclosure by the monopoly provisions found in § 416.031(2), RSMo. and Chapter 2 of the Sherman Act. Section 416.031(2) provides that "[i]t is unlawful to monopolize, attempt to monopolize, or conspire to monopolize trade or commerce in this state."

§ 416.031(2). Chapter 2 is the analogous provision of the Sherman Act which makes it an offense to monopolize, attempt to monopolize, or conspire to monopolize any part of the trade or commerce among the several States. 15 U.S.C. § 2 (1976). Section 416.141 provides that Missouri's antitrust provision "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." § 416.141. Accordingly, we will examine the potential violation of the monopoly provisions in § 416.031(2) and 15 U.S.C. § 2 at the same time.

While the trial court concluded that St. Luke's acquisition of the requested information would violate both § 416.031(2) and 15 U.S.C. § 2, it fails to explain how it reached that decision. "The offense of monopoly under § 2 has two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *Metts v. Clark Oil & Ref. Corp.*, 618 S.W.2d 698, 703 (Mo.App. E.D.1981) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). The trial court found that St. Luke's controlled 20% of the relevant sub-market. St. Luke's clearly does not have a monopoly over the sub-market. *See Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir.1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share.") (*citing United States v. Rockford Memorial Corp.*, 898 F.2d 1278, 1285 (7th Cir.1990)); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201–02 (3d Cir.1992); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694 n. 18 (10th Cir.1989); and *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945).

The Board of Trustees argues, and apparently the trial court agreed, that St. Luke's was attempting to monopolize the sub-market when it requested the documents containing pricing information. This conclusion is not supported by the record. A party "may not be liable for attempted monopoly under

§ 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize." *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. 884. The trial court made no finding with regard to the likelihood of actual monopolization and the findings that were rendered do not support such a conclusion. The trial court merely found that, if St. Luke's obtained the requested documents, it would use the pricing information to compete against NKC Hospital and that there was a substantial likelihood that this use would "affect the price of medical services to the consumers in the relevant market." The trial court made no finding relating to how the possible change in St. Luke's pricing might affect its market share. The finding made by the trial court does not equate to a finding that a dangerous probability exists that St. Luke's will monopolize the market if it obtains the requested information. Moreover, such cannot be inferred because St. Luke's only controls 20% of the relevant sub-market, while NKC Hospital currently has a 30–35% share. The requested documents containing pricing information were not protected from disclosure by the provisions of § 416.031(2) or Chapter 2 of the Sherman Act.

■ The trial court also found that many of the documents requested by St. Luke's were protected by the Missouri Uniform Trade Secrets Act, §§ 417.450 *et seq.* RSMo (Cum.Supp.1995). The court found that "revelation of the records will violate the Trustees/NKC Hospital's right of commercial privacy by allowing the disclosure of trade secrets through an unfair means."

While the documents certainly contain "trade secrets" as defined in § 417.453, the Trade Secrets Act protects only those trade secrets that are "misappropriated." Misappropriation occurs when a trade secret is acquired through "improper means." § 417.453(2). The act provides that " 'improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espio-

nage through electronic or other means." § 417.453(1). Filing a request for a document under the Sunshine Law is simply not an "improper means" within the provisions of the Trade Secrets Act. Accordingly, the statutory provisions of the trade secrets act do not provide protection for the requested records.[7] The Trade Secrets Act does not afford protection for the requested documents.

The trial court next found that "the contracts that the Trustees and/or NKC Hospital have entered into with third persons, such as insurers, physician groups, etc., are records in which those third persons have a privacy interest" and that those privacy interests were protected under the right of privacy found in the Missouri Constitution. In other words, the trial court found that private individuals and commercial entities have a right of privacy arising out of the Missouri Constitution which prevents the disclosure of their contracts with a public governmental entities.

■ "Neither the federal nor the Missouri constitutions expressly provide a right of privacy." *Cruzan by Cruzan v. Harmon,* 760 S.W.2d 408, 417 (Mo. banc 1988). "The status of the notion of a constitutional right of privacy 'still remains largely undefined.' " *City of Springfield,* 951 S.W.2d at 372 n. 3 (*quoting Whalen v. Roe,* 429 U.S. 589, 598, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)); *See also Penner v. King,* 695 S.W.2d 887, 891 (Mo. banc 1985). To the extent a Constitutional right to privacy has been recognized, that right has been extended to protect an *individual's* interest in preventing the disclosure of *personal matters. State ex rel. Callahan v. Kinder,* 879 S.W.2d 677, 681 (Mo.App. W.D.1994); *City of Springfield,* 951 S.W.2d at 372.

■ Entering into a contract with a public governmental entity is simply not a personal matter. No private individual or entity entering into a contract with a public govern-

---

7. Certainly, the Board of Trustees has valid commercial reasons for wishing to keep the information contained in the requested documents from the hands of a competitor of NKC Hospital. *State ex rel. Blue Cross & Blue Shield v. Anderson,*

897 S.W.2d 167, 170–71 (Mo.App. S.D.1995). While the protection of trade secrets perhaps should be an exception to the Sunshine Law, § 610.021 currently contains no such provision.

mental entity can have a reasonable expectation of privacy with regard to the such a contract except to the extent those contracts, or portions thereof, fall within an exception set forth in § 610.021. Contracts entered into by governmental entities are precisely the type of records the Sunshine Law seeks to provide to the public. "The clear purpose of the Sunshine Law is to open official conduct to the scrutiny of the electorate." *Hyde v. City of Columbia,* 637 S.W.2d 251, 262 (Mo.App. W.D.1982). To prevent the disclosure of contracts that public governmental bodies enter into with private entities or individuals would significantly inhibit this purpose. Section 610.021 provides specific exceptions to the Sunshine Law that would be applicable to prevent the disclosure of certain contracts or portions thereof at certain stages of negotiation. Section 610.021(12) provides that sealed bids and related documents may be closed *until* the bids are opened or all bids are accepted or rejected. Section 610.021(11) provides that specifications for competitive bidding may be closed *until* the specifications are officially approved by a public governmental body or the are published for bid. Section 610.021(2) allows a public governmental body to close records relating to the leasing, purchase or sale of real estate where public knowledge of the transaction might adversely affect the legal consideration therefor *until* the execution of the lease, purchase or sale. It is clear from these exceptions that the Legislature intended that contracts involving public governmental bodies become public records once they are accepted and finalized. The constitutional right to privacy did not prevent the disclosure of contracts the Board of Trustees and NKC Hospital entered into with third persons.

 Finally, the trial court found that any employment agreements were "individually identifiable personnel records" which could be closed under § 610.021(13).[8] However, § 610.021(13) specifically exempts "salaries" from its coverage, and employment

contracts have been held not to be "individually identifiable personnel records" falling within the ambit of § 610.021(13). *Librach v. Cooper,* 778 S.W.2d 351, 355–56 (Mo.App. E.D.1989). "Public employees may not wish their employment contracts known, but this personal desire is insignificant when contrasted to the public's interest in knowing what their public servants are being paid and under what terms and conditions." *Id.* at 355. Furthermore, the disclosure of employment contracts is not likely to significantly jeopardize the privacy of employees. *Id.* "The General Assembly did not expressly create an exception for employment contracts, and we decline to do so by implication." *Id.* The trial court erred in applying § 610.021(13) to employment agreements.

For the foregoing reasons, we conclude that the documents requested by St. Luke's are public records and must be made available as requested. While we reach this conclusion based on the provisions of the Sunshine Law, we do so with a firm conviction that the Legislature neither contemplated nor intended that private health care providers would use the law to gain a competitive advantage over much needed public institutions. Widespread use of the law for this purpose could have a devastating impact on public health care facilities throughout the state. Nonetheless, we must decline NKC's invitation to judicially amend the Sunshine Law to protect the requested records from competitive scrutiny. Statutory amendment is the prerogative of the Legislature.

The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

All concur.

---

### APPENDIX A

1. Names of all Board Members and current addresses of each Board Member of NKC Hospital and Related Entities.

---

**8.** Section 610.021(13) allows public governmental bodies to close "[i]ndividually identifiable personnel records, performance ratings or records pertaining to employees or applicants for employment, except that this exemption shall not apply to the names, positions, salaries and lengths of service of officers and employees of public agencies once they are employed as such." § 610.021(13).

2. Copies of all minutes of meetings of the Board of NKC Hospital and Related Entities, together with attachments to said minutes, for the last three (3) years.

3. Copy of resolution adopted by NKC Hospital and/or Related Entities approving and authorizing or ratifying the agreement between the City of Smithville and NKC Hospital dated July 15, 1996, and the Hospital Lease between the City of Smithville and Spelman Community Medical Center.

4. Copy of any and all resolutions adopted by NKC Hospital to form or establish Related Entities and the Articles of Incorporation and Bylaws for each Related Entity.

5. Resolution authorizing the funding of all Related Entities and copies of all documents related to the funding of Related Entities.

6. Copies of all monthly financial statements for the last three (3) years of NKC Hospital and all Related Entities.

7. Copies of any and all contracts, documents and agreements between NKC Hospital and Health Midwest or any hospitals within the Health Midwest System or entities affiliated with the Health Midwest System; copies of any and all affiliation agreements, right of first refusal agreements, or option agreements between NKC Hospital and Health Midwest or any hospital within the Health Midwest System or entities affiliated with the Health Midwest System; any and all contracts, documents, and agreements between NKC Hospital or its Related Entities and Health Midwest or hospitals within the Health Midwest System or entities affiliated with Health Midwest.

8. Copies of all legal billings and detail supporting legal billing from lawyers or law firms providing services to NKC Hospital and Related Entities for the last three (3) years.

9. Copies of all contracts, documents, and agreements, including, but not limited to physician agreements (whether the physician is employed, hospital based or an independent contractor), and employment agreements entered into by NKC Hospital and any Related Entities.

10. Copies of all business plans and strategic plans of NKC Hospital and Related Entities.

11. Copies of all contracts, agreements, documents and memorandums by and between NKC Hospital and any Related Entities.

12. Copies of all agreements, contracts, documents and billing statements pursuant to such agreements between NKC Hospital or any Related Entities and any consultants, including, but not limited to Barkley & Evergreen, Richard E. Moore, Arthur Clark Associates, Inc., Steve Hurst, Ron Hammerle, and Craig Elmore and/or JJEDCO Services.

13. Copies of any and all agreements between NKC Hospital or any Related Entities and the following:

> TriSource Healthcare, Inc.
> Blue Cross/Blue Shield (including any related or affiliated plans);
> CIGNA;
> HUMANA;
> Principal;
> PruCare; and
> Kaiser/Permanente

14. Copies of any and all agreements, contracts and documents between NKC Hospital or any Related Entities and the City of Chillicothe, Board of Trustees of the Excelsior Springs Medical Center and the Creekwood Ambulatory Surgery Center (or any entities which owned or operated the center), or any agreements, contracts or documents relating to the purchase of the Creekwood Ambulatory Surgery Center.

15. All correspondence between NKC Hospital or Related Entities (or the attorneys for the same) and the Missouri Health Facilities Review Committee, the Missouri Department of Health, or any other governmental department, entity, or agency regarding the construction or establishment of a hospital in the City of Smithville or the management or acquisition of Saint Luke's Northland Hospital—Smithville Campus.

16. All financial data, budget, or other such information relating to the projected costs of the development and operation of a trauma center or emergency room at the Saint Luke's Northland Hospital—Smithville Campus.

17. Any documents evidencing the funds, if any, currently encumbered by NKC Hospital or Related Entities for the development, acquisition or operation of the Saint Luke's Northland Hospital—Smithville Campus.

18. All documents, including but not limited to appraisals, both formal and informal, which discuss the value of Saint Luke's Northland Hospital—Smithville Campus.

19. All studies, reports, analyses, investigations, or other such documents regarding the health care needs of the citizens of Smithville and surrounding communities.

20. All studies, reports, analyses, investigations, or other such documents regarding the potential antitrust implications of the acquisition of the Saint Luke's Northland Hospital—Smithville Campus by the City of Smithville with the subsequent leasing of the facility to NKC Hospital.

21. Any surveys, reports, analyses, studies, or other such documents regarding the development, acquisition, use, or operation of the Saint Luke's Northland Hospital—Smithville Campus.

22. Any surveys, reports, analyses, studies, or other such documents regarding environmental, structural, and mechanical inspections of the Saint Luke's Northland Hospital—Smithville Campus.

23. Any surveys, reports, studies, analyses, or other such documents regarding the construction, establishment or lease of a hospital in the City of Smithville and/or the financial viability of such a facility.

24. Any surveys, investigations, reports, studies, analyses, or other such documents regarding the purchase or lease of lands for hospital and/or health care purposes by NKC Hospital or Related Entities.

### APPENDIX B

With reference to the numbered paragraphs of your letter, you are advised that the following records will be available to you for inspection and duplication . . . :

Request # :

1. Names and addresses of the Board members of the Hospital and Meritas Corporation.

2. Minutes of the open meetings of the Board of Trustees of the Hospital from July, 1993, to June, 1996.

4. Documents related to the establishment of Meritas Health Corporation, including Articles of Incorporation and Bylaws.

5. Any resolutions authorizing the funding of Meritas Health Corporation will be obtainable through a review of the minutes referenced in paragraph 2 herein. Access to documents relating to the funding of Meritas or any other entity or transaction not referenced in the open minutes of the Hospital Board of Trustees or attached thereto by Resolution is denied.

6. Financial information pertaining to the Hospital for the last 3 years will be obtainable through a review of the minutes referenced in paragraph 2 herein.

We are unaware of the existence of any records of the type described in paragraphs 15 and 20 of your letter.

Pursuant to Mo.Rev.Stat. Section 610.010 *et seq.*, you are advised that access is denied with respect to each and every other request for inspection of records contained in your letter, specifically paragraphs 3, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 21, 22, 23, and 24.