

# In the
# Missouri Court of Appeals
## Western District

AARON M. MALIN,

      **Appellant,**

v.

MISSOURI ASSOCIATION OF
COMMUNITY TASK FORCES
(D/B/A/ ACT MISSOURI),

      **Respondent.**

**WD85453**
**OPINION FILED:**
**May 16, 2023**

### Appeal from the Circuit Court of Cole County, Missouri
The Honorable Cotton Walker, Judge

Before Division Three:  Janet Sutton, Presiding Judge, Cynthia L. Martin, Judge, and
Edward R. Ardini, Jr., Judge

Aaron Malin ("Malin") appeals the trial court's entry of summary judgment in

favor of Missouri Association of Community Task Forces ("ACT Missouri").  Malin

argues that the trial court committed legal error when it concluded that ACT Missouri is

not a quasi-public governmental body for purposes of Missouri's Sunshine Law.  Finding

no error, we affirm.

## Factual and Procedural Background[1]

ACT Missouri is a not-for-profit corporation organized in Missouri under chapter 355. ACT Missouri provides consultation, technical assistance, training, and education to coalitions, otherwise known as community task forces, across the state of Missouri as they relate to substance abuse prevention. ACT Missouri publicly identifies six "Ways We Can Help" in the following areas: "statewide training and resource center; financial services/fiscal management; prevention education and awareness; public policy support and training; advocacy support and training; and media campaign consultation." ACT Missouri's mission is "to serve as the statewide prevention catalyst, empowering individuals and fostering partnerships to promote safe, healthy, and drug-free communities," and this mission has remained the same since ACT Missouri was organized in 1991. ACT Missouri's funding sources have varied over the years, but have included a combination of fees, private donations, federal funds received directly from the federal government, and block grants from the federal government but distributed through the state.

From July 1, 2011 through December 31, 2019, ACT Missouri provided services under a "Contract For Services" with the Missouri Department of Mental Health

---

[1]"The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record. However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the motion for summary judgment." *McKay v. Peloza*, 658 S.W.3d 195, 196 n.1 (Mo. App. W.D. 2022) (quoting *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 453 (Mo. banc 2011)).

("DMH"), and in return, ACT Missouri received federal block grant funds from DMH

("DMH contract"). The DMH contract provided, "Funding for this contract comes from

the Substance Abuse Prevention and Treatment Block Grant ["SABG"] and is therefore

subject to the federal rules and regulations associated with that grant." ACT Missouri has

had no Contract for Services with DMH, and has received no finding from DMH, since

December 31, 2019.

On January 9, 2018, Malin sent ACT Missouri a request for public records

pursuant to Missouri's Sunshine Law, section 610.010 *et seq.* ("Sunshine Law").[2] Malin

requested "any and all documents relating to funding acquired from [DMH] during fiscal

[years 2016 and 2017]." On January 12, 2018, Chuck Daugherty, ACT Missouri's

executive director, sent Malin an email stating that his request for records was denied

because "ACT Missouri is not a covered entity under Chapter 610, RSMo and more

specifically Section 610.010(4)."

Malin filed suit on January 23, 2018 in the Circuit Court of Cole County, alleging

that ACT Missouri's failure to act upon his request for public records was a knowing or

purposeful violation of the Sunshine Law. Malin alleged that ACT Missouri is a quasi-

public governmental body under both sections 610.010(4)(f)a and 610.010(4)(f)b

"because its primary purpose is to enter into contracts with public governmental bodies or

to engage primarily in activities carried out pursuant to an agreement or agreements with

[2]All statutory references are to RSMo 2016, as supplemented through the date of Malin's Sunshine Law request, unless otherwise indicated.

3

public governmental bodies and because it is an association that directly accepts the appropriation of money from public governmental bodies."

Three months later, prior to the completion of discovery, ACT Missouri filed a motion for summary judgment, which argued that ACT Missouri is not subject to the Sunshine Law because it is not a quasi-public governmental body as defined in either section 610.010(4)(f)a or section 610.010(4)(f)b. ACT Missouri asserted that for purposes of section 610.010(4)(f)a, the trial court was limited to examining ACT Missouri's statement of purpose contained in its articles of incorporation, and that because its statement of purpose did not include entering into contracts with public governmental bodies or engaging primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies, it is not a quasi-public governmental body under that section. ACT Missouri also argued that it did not qualify as a quasi-public governmental body under the plain language of section 610.010(4)(f)b. The trial court granted summary judgment in favor of ACT Missouri, and Malin appealed.

In *Malin v. Missouri Association of Community Task Forces*, 605 S.W.3d 419 (Mo. App. W.D. 2020) ("*Malin I*"), this Court affirmed the trial court's conclusion that ACT Missouri was not a quasi-public governmental body under section 610.010(4)(f)b. However, we held that the trial court prematurely granted summary judgment with respect to ACT Missouri's status as a quasi-public governmental body under section 610.010(4)(f)a because the trial court improperly "accepted ACT Missouri's argument that the articles of incorporation provided the only relevant evidence" to make that

4

determination. *Id*. at 426. *Malin I* held that to determine whether an entity is a quasi-public governmental body pursuant to section 610.010(4)(f)a because its primary purpose is to enter into contracts with public governmental bodies or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies, a trial court must consider not only the purpose statement in the entity's articles of incorporation, but also "present and historical activities of the entity, the nature of any relationship the entity has with public governmental bodies, the governing structure of the entity in addition to other aspects of the organization's existence and operation that would be probative of its purpose." *Id.* (hereinafter "primary purpose factors"). Because the trial court had not permitted discovery on all of the primary purpose factors, nor considered same in granting summary judgment, the case was remanded for further proceedings. *Id*. at 427.

On remand, and after the completion of discovery, Malin and ACT Missouri filed cross-motions for summary judgment addressing ACT Missouri's status as a quasi-public governmental body under section 610.010(4)(f)a in light of the primary purpose factors. Each argued there was no genuine dispute as to the existence of material facts and that the only issue to be determined was the application of section 610.010(4)(f)a to the uncontroverted facts as a matter of law.

On May 5, 2022, the trial court granted ACT Missouri's motion for summary judgment and denied Malin's cross-motion for summary judgment ("Judgment"). The trial court considered the uncontroverted facts, made findings with respect of the primary purpose factors based on the uncontroverted facts, and then concluded:

5

> When this court examines the five factors identified by the Court of Appeals as relevant to an organization's purpose . . . it concludes that ACT Missouri's primary purpose is as follows: ACT Missouri provides leadership, support activities, and a network of information related to at-risk behavior and promoting healthy lifestyles. This purpose distinguishes ACT Missouri from a quasi-public government body and thus the application of these factors supports summary judgment in favor of [] ACT Missouri, and denial of [Malin's] summary judgment motion.

The trial court correspondingly denied Malin's claim that ACT Missouri knowingly and purposefully violated the Sunshine Law.

Malin appeals.

**Standard of Review**

We review the grant of summary judgment *de novo. Show-Me Inst. v. Office of Admin.*, 645 S.W.3d 602, 607 (Mo. App. W.D. 2022) (citation omitted). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6). In determining whether the entry of summary judgment was appropriate, we "review[ ] the record in the light most favorable to the party against whom judgment was entered, and give[ ] the non-movant the benefit of all reasonable inferences from the record." *Show-Me Inst.*, 645 S.W.3d at 607 (quoting *Estes as Next Friend for Doe v. Bd. of Trs. of Mo. Pub. Entity Risk Mgmt. Fund*, 623 S.W.3d 678, 686 (Mo. App. W.D. 2021)). A defending party is entitled to summary judgment if it demonstrates one of the following:

> (1) facts negating any one of the claimant's elements; (2) that the party opposing the motion has presented insufficient evidence to allow the finding of the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support a properly pleaded affirmative defense.

6

*Channel v. Walker*, 655 S.W.3d 362, 370 (Mo. App. W.D. 2022) (quoting *Ameristar Jet Charter, Inc. v. Dodson Intern. Parts, Inc.*, 155 S.W.3d 50, 58-59 (Mo. banc 2005)). "We will affirm the trial court's granting of summary judgment if it is correct as a matter of law on any grounds." *Show-Me Inst.*, 645 S.W.3d at 607 (quoting *Behrick v. Konert Farms Homeowners' Ass'n*, 601 S.W.3d 567, 573 (Mo. App. E.D. 2020)).

## Analysis

Malin raises two points on appeal. Neither point expressly claims error in either the grant or denial of the parties' cross-motions for summary judgment, and instead, both points challenge the trial court's conclusions regarding the primary purpose factors relevant to determining whether ACT Missouri is a quasi-public governmental body pursuant to section 610.010(4)(f)a. We generously construe the points to challenge the grant of ACT Missouri's motion for summary judgment and the corresponding denial of Malin's cross-motion for summary judgment, as Malin's requested relief from this Court is reversal of the grant of summary judgment in favor of ACT Missouri, and a finding that at all relevant times, ACT Missouri was a quasi-public governmental body under the Sunshine Law.[3]

---

[3]An order denying a motion for summary judgment is not a final judgment that is subject to appellate review. However, when the merits of a denied motion for summary judgment are inextricably intertwined with the merits of a motion for summary judgment that has been granted, such that the resolution of an appeal from the grant of summary judgment will have the practical effect of requiring the conclusion that error was committed in denying the intertwined motion for summary judgment, we are permitted to review the denial. *See, e.g.*, *Sauvain v. Acceptance Indem. Ins. Co.*, 339 S.W.3d 555, 568-69 (Mo. App. W.D. 2011) (citations omitted).

Section 610.010(4)(f)a defines a "quasi-public governmental body" as "any person, corporation or partnership organized or authorized to do business in this state pursuant to the provisions of chapter 352, 353, or 355, or unincorporated association which . . . [h]as as its primary purpose to enter into contracts with public governmental bodies, or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies[.]"  Malin's points on appeal focus on the relationship between ACT Missouri and DMH, not the federal government, consistent with the fact that "[s]ection 610.010.4(f)(a) is written in terms of whether [an organization] 'has as its primary purpose to enter into contracts' or 'to engage primarily' in relations with Missouri public governmental bodies."  *SNL Securities, L.C. v. National Ass'n of Ins. Com'rs*, 23 S.W.3d 734, 737 (Mo. App. W.D. 2000).  As we held in *Malin I*, to determine whether an entity's primary purpose is as described in section 610.010(4)(f)a, a trial court must review the primary purpose factors, which include the purpose statement in an entity's articles of incorporation, present and historical activities of the entity, the nature of any relationship the entity has with public governmental bodies, the governing structure of the entity, and other aspects of the organization's existence and operation that would be probative of its purpose.  605 S.W.3d at 426.

Malin's second point on appeal takes issue with the trial court's consideration of the primary purpose factor addressing ACT Missouri's relationship with DMH, and in particular claims that it was legal error to conclude that ACT Missouri did not have a "contract" with DMH, and was instead the recipient of a subaward of grant funds from the federal government.  Malin's first point on appeal challenges the trial court's

8

conclusions about other primary purpose factors, and the trial court's ultimate conclusion that ACT Missouri did not have as its primary purpose entering into contracts with public governmental bodies or engaging primarily in activities carried out pursuant to agreements with public governmental bodies. We address the points together by reviewing each of the primary purpose factors.[4]

### a) *Purpose Statement in the Articles of Incorporation*

ACT Missouri's purpose statement in its articles of incorporation is as follows:

Realizing that Community Task Forces develop and function at different levels, and therefore exhibit different needs, the Association of Community Task Forces will provide:

---

[4]Though Malin argues that the uncontroverted facts relating to the primary purpose factors establish that ACT Missouri is a quasi-public governmental body pursuant to section 610.010(4)(f)a, Malin's brief never directs this court to specific Rule 74.04(c) paragraphs and responses thereto in the summary judgment record to support this contention. Instead, Malin makes conclusory factual statements, or refers generally to exhibits and affidavits attached to summary judgment pleadings, without connecting the assertions or references to uncontroverted facts. "Facts come into a summary judgment record *only* via Rule 74.04(c)'s numbered-paragraphs-and-responses framework." *Green v. Fotoohighiam*, 606 S.W.3d 113, 117 (Mo. banc 2020) (quoting *Jones v. Union Pac. R.R. Co.*, 508 S.W.3d 159, 161 (Mo. App. S.D. 2016)). "[A]n appellate court reviewing an entry of summary judgment need only consult what was properly put before it by way of Rule 74.04(c) paragraphs and responses." *In re Glendale Lee Becking Tr.*, 648 S.W.3d 810, 817 (Mo. App. S.D. 2022) (quoting *Green*, 606 S.W.3d at 121). "[A]rguments . . . that are completely disconnected from the numbered paragraph material facts in the summary judgment record, as required by Rule 74.04, are analytically useless in an appellate review that requires this court to properly apply Rule 74.04[.]" *Id.* (quoting *Green*, 606 S.W.3d at 120).

Because Malin's brief fails to comport with this requirement, rejection of his points on appeal on that basis alone would be warranted. However, because neither party contends that there are material facts in dispute in this case, and because both parties agree the only issue before this court is the legal significance of the uncontroverted facts, we are able to avoid impermissibly "act[ing] as an advocate for a party" by "sift[ing] through the entire record to identify" whether undisputed issues prevent the entry of judgment as a matter of law. *Green*, 606 S.W.3d at 118. Therefore, we *ex gratia* elect to address the merits of Malin's points on appeal.

* Grass roots leadership
* Support activities
* A central point of information sharing among communities

In cooperation with task forces dealing with at-risk behavior and promoting healthy life styles, the ACT will provide a network of information regarding agencies and their services to Community Task Forces within the state of Missouri and all other legal powers permitted general Not-For-Profit Corporations. The corporation is organized exclusively for charitable or educational purposes within the meaning of Section 501(C)(3) of the Internal Revenue Code.

Malin acknowledges that ACT Missouri's purpose statement does not state that it intends to enter into contracts with public governmental bodies or to provide services pursuant to agreements with public governmental bodies. Malin nonetheless argues, without citation to any uncontroverted facts in the summary judgment record, that ACT Missouri fulfilled its purpose statement "largely using government money and pursuant to contracts and agreements with state governmental bodies." This assertion, whether or not established by the uncontroverted facts, is irrelevant. How ACT Missouri carried out the purpose statement in its articles of incorporation might be relevant to other primary purpose factors, but it is not relevant to alter the expressed purpose statement in ACT Missouri's articles of incorporation. The trial court did not commit legal error by concluding that this primary purpose factor supports a finding that ACT Missouri is not a quasi-public governmental body under section 610.010(4)(f)a.

b) *Governing Structure*

Malin next argues that "ACT Missouri's governing structure [] supports a finding that it is a quasi-public governmental body [because] the organization has up to [twenty]

10

board members, at least [four] of whom can be representatives of government entities" and therefore, "ACT Missouri seeks to have governmental representation in its governing structure." We disagree. Though ACT Missouri's bylaws authorize up to four board members from government agencies, that alone does not support or require a finding that ACT Missouri is a quasi-public governmental body under section 610.010(4)(f)a.

ACT Missouri's by-laws provide that its board of directors shall consist of no more than twenty people, who "shall *represent* the following entities and shall be *limited to one representative from each community or institution*":

2 members from each geographical region in the state of Missouri. (12 total)

Up to 2 members from private corporate institutions in the state of Missouri.

Up to 4 members from other institutions in the state of Missouri. These *may* include:

> MIPS[5]
> The Department of Elementary and Secondary Education
> The Department of Mental Health Division of Alcohol and Drug Abuse
> The Department of Public Safety
> The Department of Health

Up to 2 members at-large.

(Emphasis added). While the by-laws permit (but do not require) up to four members representing state agencies, from 2015 to the present, no member of ACT Missouri's board of directors has been an employee or representative of any public governmental

---

[5]The bylaws do not state what "MIPS" is an acronym for, but it is listed as an "institution[] in the state of Missouri" with the other identified state agencies, and both parties agree that it is a state public institution.

11

body.  And even had they been, public governmental body members would not have been in a position to control the actions of the board of directors given the size of the board.

ACT Missouri's by-laws and actual practices are in stark contrast to those in *North Kansas City Hospital Board of Trustees v. St. Luke's Northland Hospital*, 984 S.W.2d 113 (Mo. App. W.D. 1998), a case relied on in *Malin I* to explain why an entity's governance structure is relevant to determining the entity's primary purpose pursuant to section 610.010(4)(f)a.  *Malin I*, 605 S.W.3d at 426.  In *North Kansas City Hospital Board of Trustees*, the court considered the statement of purpose in a municipal hospital's articles of incorporation, and the required composition and activities of the hospital's board of directors.  The municipal hospital's bylaws provided that four of the nine members of its board of directors were required to be members of the hospital's board of trustees, which the court determined to be "merely a part of the city government[,] just like the mayor, the city council, [and] zoning commissions . . . ."  *Id.* at 117-18.  Two of the hospital's nine board members were required to be city employees.  *Id.*  In addition, the hospital's articles of incorporation provided that the hospital "shall be operated exclusively for the benefit of, to perform the functions of, and to carry out the purposes of the [board of trustees]."  *Id.*  The plain effect of the municipal hospital's governance structure evidenced an inherent obligation to engage primarily in activities carried out pursuant to agreements with public governmental bodies, as contemplated by section 610.010(4)(f)a.  *Id.* at 118.  As a result, the court in *North Kansas City Hospital Board of Trustees* found that the municipal hospital was a quasi-public governmental body since

12

the hospital "was incorporated, and is wholly owned, by the Board of Trustees, and its Board of Directors is dominated and controlled by the Board of Trustees." *Id*.

Thus, it is not enough that government officials are authorized to serve on an entity's board of directors. Instead, the entity's governance structure must reflect that the entity operates in actual or tacit agreement with, or under the effective control of, a public governmental body. That conclusion cannot be reached with respect to ACT Missouri. The mere fact that four of twenty members of ACT Missouri's board of directors could (but were not required) to be representatives of government agencies does not subject ACT Missouri to being "dominated and controlled" by a public governmental body.

This conclusion is not altered by Malin's contention that because two elected members of the Missouri General Assembly served on the board of directors at some point between 2015 and 2021, ACT Missouri is a quasi-public governmental body. ACT Missouri's by-laws do not expressly authorize or prohibit elected officials from serving on the board of directors. The by-laws do specify service on the board of directors by two members from each geographical region of the state (twelve total members), two members from private corporate institutions, and two members at-large. The mere fact that over a six-year span of time, two of these sixteen positions on the board of directors happened to have been filled by elected members of the General Assembly is insufficient to support the conclusion that ACT Missouri's board of directors is "dominated or controlled" by a public governmental body.

The trial court did not commit legal error when it concluded that ACT Missouri's governance structure does not permit the conclusion that ACT Missouri is a quasi-public

13

governmental body pursuant to section 610.010(4)(f)a because it's primary purpose is to enter into contracts with public governmental bodies, or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies.

### c) Present and Historical Activities

Malin argues that ACT Missouri's present and historical activities support the conclusion that its primary purpose is to enter into contracts with public governmental bodies or to engage primarily in activities carried out pursuant to an agreement with public governmental bodies. Specifically, Malin argues that because ACT Missouri was required to expend funds it received from DMH pursuant to the terms and conditions set forth in the DMH contract, it is a quasi-public governmental body.[6]

Malin's Sunshine Law request was made on January 9, 2018. Malin focuses on ACT Missouri's activities from 2016 to 2018, and asserts that during that timeframe, "a majority of ACT Missouri's funding . . . came to it pursuant to" the DMH contract, and

---

[6]The parties disagree about the temporal period that is relevant to this primary purpose factor. Malin argues that "present activities" refers only to activities that were being undertaken at the time of a Sunshine Law request, and that historical activities occur before that date. Malin's contention discounts any relevance in considering the activities of an entity after a Sunshine Law request to determine its primary purpose. The trial court rejected Malin's position, and instead held that "present activities" refers to activities that are being undertaken when Sunshine Law litigation is resolved, with all activities predating that falling into the category of historical activities.

A common-sense interpretation of the primary purpose factor addressing "present and historical activities" includes all of an entity's activities before, at the time of, and after a Sunshine Law request. The conclusions about an entity's primary purpose drawn from those activities may be influenced, of course, by any evidence that suggests an entity altered its activities after a Sunshine Law request in an effort to subvert the requirements of the Sunshine Law. But it similarly follows that an entity's status as a quasi-public governmental body should not be determined based on the entity's activities during an isolated snapshot in time.

14

that with this funding, ACT Missouri was able to pay its staff and fund its activities. Malin argues, without citation to any legal authority, that "[w]hen the majority of an entity's budget comes to it from a governmental body pursuant to a contract or agreement, that entity's primary purpose under the Sunshine Law is to enter into contracts with and/or to engage primarily in activities pursuant to an agreement with a public governmental body."

The uncontested factual record reflects that in fiscal year 2016, ACT Missouri received $1,168,374 through the DMH contract, accounting for sixty-two percent of its total revenue. In fiscal year 2017, ACT Missouri received $1,306,954 through the DMH contract, accounting for sixty-five percent of its total revenue. In fiscal year 2018, ACT Missouri received $1,097,780 through the DMH contract, accounting for seventy-nine percent of its total revenue.

However, the uncontested factual record also reflects that in those same fiscal years, ACT Missouri's activities were also funded by revenues from fees, private donations, and federal funds received directly from the federal government, and that ACT Missouri had been receiving some federal grant money through the DMH contract since at least 2011. Though the DMH contract accounted for more than fifty percent of ACT Missouri's revenue during some fiscal years, ACT Missouri was organized in 1991, and throughout that time its mission "to serve as the statewide prevention catalyst, empowering individuals and fostering partnerships to promote safe, healthy, and drug-free communities" has remained unchanged. The entirety of ACT Missouri's present and historical activities do not support a conclusion that ACT Missouri has the primary

15

purpose to enter into contracts with public governmental bodies, or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies. Instead, the ability to secure federal block grant funding through the DMH contract appears to be no more than a revenue opportunity seized upon by ACT Missouri to foster its mission.

Consistent with this observation, though a majority of ACT Missouri's funding during fiscal years 2016 through 2018 came thought the DMH contract, ACT Missouri's activities during that same time frame went far beyond the activities contemplated by the DMH contract. Pursuant to the DMH contract, ACT Missouri was to "provide substance abuse prevention related services, as required by [DMH]," including "program funding administration . . . training, public education, a statewide resource center, and a prevention conference." Malin admits that during fiscal years 2016 and 2017, ACT Missouri's activities went beyond providing services specified by the DMH contract, and included: (1) providing "trainers for professional training activities: University of Oklahoma Southwest Regional Expert Team (SWRT) Substance Abuse Prevention Skills Training; Kansas SWRT Substance Abuse Prevention Skills Training; and Missouri Youth Adult/Alliance;" (2) coordinating a prescription drug and medication takeback campaign; (3) acting as a fiscal agent (i.e. performing accounting, reporting, and grant administrative services) "for the following programs: Midwest Conference on Problem Gambling & Substance Abuse Conference; Division of Developmental Disabilities Autism Symposium; Division of Developmental Disabilities Regional Workshops; Kids Beat Program; Mo Alliance for Endangered Children (MODEC); Students Against

16

Destructive Decisions (SADD); and Youth Ambassador Program (MYAA);" (4) participating in national, regional, and state partnerships "outside of any state contract: National Institution of Drug Abuse (NDA) and National Drug Endangered Children (NADEC); Children's Trust Fund; Missouri Prevention Partners; BJC School Outreach and Youth Development; Missouri Juvenile Justice Association; Missouri School Resource Officer Association; PDMP Now; Phoenix Health Programs; Partners in Prevention; and Missouri Recovery Network;" (5) attending workforce development trainings, including "MODOT's Impaired Driving Summit and Strategic Planning and MODOT's Youth Driving Summit and Strategic Planning; Project Link Training; Youth Mental Health First Aid; and From Darkness to Light;" (6) providing training to the following entities: "Jefferson City Chamber of Commerce Social Media Forum; Deterra System Information for the Drug Court Board and Jefferson City Rotary West; Drug Endangered Children for BJC Healthcare School Nurse Conference; Youth Mental Health First Aid; Darkness to Light; Drugged Driving Webinar; Under the Influence - Safe Teen Driving Webinar, Hepatitis B webinar; and Mental Health presentation to Columbia Rotary;" and (7) participating in fundraising events to help the MYAA program.

Though the uncontroverted record establishes that during fiscal years 2016 through 2018, ACT Missouri received more than fifty percent of its revenue through the DMH contract, and provided some services pursuant to the terms of that contract,[7] the

---

[7]Insofar as Malin mentions an agreement with the Missouri Department of Transportation ("MODOT") in the argument portion of his brief, the argument is not fully

trial court did not error in finding that the present and historical activities factor does not support a conclusion that ACT Missouri's primary purpose was to enter into contracts with public governmental bodies, or to engage primarily in activities carried out pursuant to an agreement or agreements with public governmental bodies.

### d) The Nature of any Relationship with Public Governmental Bodies

In addressing the primary purpose factor focusing on the nature of an entity's relationship with public governmental bodies, Malin focuses on the relationship between ACT Missouri and DMH. Malin alleges that ACT Missouri entered into a written agreement with DMH in order to receive funds to carry out its activities, and that it was error for the trial court to conclude that the written agreement was not a "contract" under federal grant program guidelines and was instead a means by which ACT Missouri could be a subrecipient of a subaward of federal grant funds.

Malin emphasizes that the written agreement between ACT Missouri and DMH is titled "Contract For Services," is identified as "Contract #: SDA420P1215," and was signed by a DMH deputy director and the executive director of ACT Missouri. Malin points out that the written agreement states that "[DMH] desires to contract for the

developed or supported by any citation to the summary judgment record. The only reference in the summary judgment pleadings to activities concerning MODOT was that ACT Missouri was a fiscal agent to the Missouri Youth Adult Alliance ("MYAA"), a statewide youth coalition that at one time received state funding. Because MYAA did not have leadership or ability to manage its own funding, ACT Missouri managed MYAA's state funding and provided meeting space, training, and support services. Pursuant to a contract with MODOT, MYAA received approximately $30,000 in 2013 to 2014, $30,000 in 2014 to 2015, and $50,000 in 2015 to 2016. These uncontroverted facts do not establish that ACT Missouri "entered into agreements directly with . . . MODOT" as Malin summarily concludes in his brief.

18

services described herein. All terms, conditions, and prices contained herein shall govern the performance of this contract."  Malin notes that the written agreement was renewed annually from July 1, 2011 through December 31, 2019.

Conversely, ACT Missouri emphasizes that the written agreement with DMH provides that "[f[unding for this contract comes from the [SABG] and is therefore subject to the federal rules and regulations associated with that grant."

The trial court found that under the SABG program guidelines, ACT Missouri was a subrecipient that received a subaward of federal block grant funds, and that the state (and specifically DMH) merely served as a pass-through entity for distributing federal funds.  The trial court found that pursuant to federal grant program guidelines, the written agreement between DMH and ACT Missouri was not a "contract" as contemplated by section 610.010(4)(f)a.  Because federal agencies are not encompassed within the scope of "public governmental bodies" under the Sunshine Law,[8] the trial court found that ACT Missouri's relationship with the federal government as a subaward recipient of federal funds could not support a finding that ACT Missouri had as its primary purpose entering into contracts with a public governmental body or engaging primarily in activities pursuant to an agreement with a public governmental body.

---

[8]Malin does not challenge this conclusion, which is consistent with the definition of "public governmental body" found at section 610.010(4), which provides that a "public governmental body" is "any legislative, administrative or governmental entity created by the Constitution or statutes of this state, by order or ordinance of any political subdivision or district, judicial entities when operating in an administrative capacity, or by executive order[.]"

19

42 USCA section 300x-21 *et seq.* authorizes the United States Department of Health and Human Services ("HHS") to administer the SABG to states which may expend the grant for "planning, carrying out, and evaluating activities to prevent, treat, and provide recovery support services for substance use disorders . . . ." States may utilize third party, nongovernmental organizations to administer the services and those organizations are responsible for complying with the SABG requirements. 42 U.S.C.A. section 300x-32(b)(1)(A), section 300x-65.

Part 75 of title 45 of the Code of Federal Regulations establishes the "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards" to non-federal entities. 45 C.F.R. section 75.100(a), (b). 45 C.F.R. section 75.2 provides definitions, including for "contract," "pass-through entity," "subaward" and "subrecipient":

> Contract means a legal instrument by which a non–Federal entity purchases property or services needed to carry out the project or program under a Federal award. ***The term as used in this part does not include a legal instrument, even if the non–Federal entity considers it a contract, when the substance of the transaction meets the definition of a Federal award or subaward*** (see Subaward).
>
> . . . .
>
> Pass-through entity means a non–Federal entity that provides a subaward to a subrecipient to carry out part of a Federal program.
>
> . . . .
>
> Subaward means an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity. It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program. A

20

subaward may be provided through any form of legal agreement, ***including an agreement that the pass-through entity considers a contract.***

. . . .

Subrecipient means a non–Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program. A subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency.

45 C.F.R. section 75.2 (Emphasis added).

These provisions appear to support the trial court's conclusion that DMH is merely a pass-through entity for the distribution of federal grant funds, and that ACT Missouri is a subrecipient of federal grant funds receiving a subaward of those funds. However, with respect to the trial court's conclusion that these provisions mean that the agreement between DMH and ACT Missouri is not a "contract," Malin points out that 45 C.F.R. section 75.2 is confusing, as it provides in one place that the term "contract" "as used in this part does not include a legal instrument, even if the non–Federal entity considers it a contract, when the substance of the transaction meets the definition of a Federal award or subaward (see Subaward)," but then provides in the definition of "subaward" that a "subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract." This confusion is potentially contributed to by the regulations at 45 C.F.R. 96.120 *et seq.* which apply specifically to the SABG, and which do not specify whether the state can have a "contract" with the ultimate recipient of SABG grant funds.

21

We need not decide whether the SABG is subject only to the federal regulations at 45 C.F.R. 96.120 *et seq.*; whether the SABG is subject to the regulations at both 45 C.F.R. 96.120 *et seq.* and part 75 of title 45 of the Code of Federal Regulations; or how the definitions in 45 C.F.R. section 75.2 should be reconciled on the subject of contracts. Even if we assume that the written agreement between DMH and ACT Missouri is a "contract" as contemplated by section 610.010(4)(f)a, that contract is insufficient by itself to establish that ACT Missouri's ***primary*** purpose is to enter into contracts with public governmental bodies or to engage primarily in activities carried out pursuant to an agreement with public governmental bodies.

The relationship between DMH and ACT Missouri must be weighed with all of the primary purpose factors to determine whether ACT Missouri qualifies as a quasi-public governmental body under section 610.010(4)(f)a. As we have already explained, the uncontested facts establish that ACT Missouri has had varied sources of revenue and activities unrelated to the DMH contract throughout its existence. The uncontested facts establish that ACT Missouri first entered into the DMH contract in 2011, twenty years after ACT Missouri was formed, and that ACT Missouri has continued providing services consistent with its mission since the end of 2019 when its relationship with DMH ended. As we have already explained in connection with the other primary purpose factors relied on by Malin,[9] the trial court did not error in concluding with respect to each of those

---

[9]*Malin I* made it clear that the primary purpose factors are not limited to the factors discussed in this Opinion, but include as well other aspects of the organization's existence and operation that would be probative of its purpose. 605 S.W.3d at 426. The trial court found, and Malin does not contest, that no other aspects of ACT Missouri's

22

factors that ACT Missouri did not have as its *primary* purpose entering into a contract with a public governmental body, or engaging primarily in activities pursuant to an agreement with a public governmental body.

Thus, even if we presume the written agreement between DMH and ACT Missouri is a "contract" despite federal regulations which could be interpreted to the contrary, we would not conclude that the contract is sufficient to support a conclusion that ACT Missouri's *primary* purpose was to enter into a contract with a public governmental body or to engage primarily in activities pursuant to an agreement with a public governmental body. "[A]n entity might be found to have multiple purposes. However, in determining whether an entity is a quasi-public governmental body under section 610.010(4)(f)(a), a court is only interested in the entity's 'primary' purpose." *Malin*, 605 S.W.3d at 426 n.9.

We find no legal error in the trial court's conclusion that the primary purpose factors, collectively viewed, supported the legal conclusion that ACT Missouri is not a quasi-public governmental body pursuant to section 610.010(4)(f)a, even if the relationship between DMH and ACT Missouri is a "contract" as contemplated by that section.[10]

---

existence and operations were raised as probative on the issue of primary purpose beyond the specific factors herein discussed.

[10]We therefore reject Malin's assertion that the Sunshine Law applies to ACT Missouri because "when a nonprofit chooses to get its funding pursuant to contracts and agreements with governmental bodies, then the public has a right to know what the entity is doing with the money it receives." There is no provision in the Sunshine Law that subjects an entity to the obligations therein described simply because the entity receives funding from a public governmental body. Nor is there authority for the proposition that

Malin's Points One and Two are denied.

## Conclusion

The trial court's Judgment is affirmed.

_____
Cynthia L. Martin, Judge

All concur

---

because an entity gets funding from a public governmental body, it is a quasi-public governmental body as a matter of law.

24